1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

7
8

**Kyle DeBerry,**
Petitioner
-vs-
**Dora B. Schriro, et al.,**
Respondent(s)

9
10

CV-04-0858-PCT-SMM (JI)

**REPORT & RECOMMENDATION**
**On Petition for Writ of Habeas Corpus**
**Pursuant to 28 U.S.C. § 2254**

11

## I. MATTER UNDER CONSIDERATION

12
13
14
15
16
17

Petitioner, presently incarcerated in the Arizona State Prison Complex at Safford, Arizona, filed a Second Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on May 8, 2007 (#60).  On August 12, 2004 Respondents filed their Answer (#9) to the original Petition (#1), and on March 16, 2007, filed their Supplemental Answer (#54). Petitioner filed a Traverse on April 12, 2007 (# 57) and a Notice of Errata (#58) on April 13, 2007.

18
19
20
21
22

The Petitioner's Second Amended Petition is now ripe for consideration.  Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

23

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

24

### A. FACTUAL BACKGROUND

25
26

The presentence report included the following description by Petitioner of the events leading to his conviction:

27
28

> The defendant related that he had [a] long history of drug abuse
> and enjoyed doing drugs.  The defendant had met the victim, Lamont

Lattery, who was able to supply the defendant with the drugs he needed. [Through] this association the victim and defendant became friends, but the victim wanted to carry it to the extreme. The defendant contends that in the beginning of their friendship he did not realize that the victim was gay, and in no way encouraged the victim that he wanted an intimate relationship. He noted that he had no problem with the victim being gay, and thought he made it clear to the victim that he was not gay. The defendant figured that the victim had taken his kindness for weakness, and continued to make sexual advances toward the defendant. The defendant stated that the victim's unwanted advances provoked a physical confrontation between them. The defendant told the victim that he never wanted to have anything to with the victim again. The defendant stated that this did not stop the victim and he continued to "stalk" the defendant. The victim's obsession with him increased and everywhere he turned the victim was there. The victim began telephoning the defendant and leaving threatening messages on his answering machine. The defendant contends that he could not report the victim to the police because the he was heavily involved in drugs and the victim would just turn him in. He also believed the police would not believe him anyway.

The threats and intimidation continued until the point where the defendant could not take any more. On the day of the instant offense the victim had called the defendant and they agreed to meet at [a] location on Herald Ranch Road where the victim would usually make his drug contacts. Due to his abuse of drugs the defendant was "paranoid and not thinking straight," when he agreed to meet with the victim. He feared that the victim might bring friends or a weapon. The defendant wanted to be prepared to defend himself so [he] decided to bring the loaded black powder pistol to scare the victim.

When he met up with the victim, they got into a verbal argument. The defendant showed the victim the gun, but the victim continued to advance on the defendant, yelling, "Fuck you, you're a pussy." The victim then told that defendant, "I'm going to kill your ass. I'm going to fuck you." At that point the defendant feared for his life and that is when he must have pulled the trigger to the pistol. The defendant does not remember pulling the trigger, but knew what he had done was wrong. The defendant then fled the area[, and] met up with a friend who took the gun and hid it for him.

(Answer, #9, Exhibit B, Presentence Report at 3-4.) (Exhibits to the Answer, #9, are referenced hereinafter as "Exhibit ___.") The following day, the victim's body was found, and upon searching the victim's residence, police discovered the victim's journal reflecting that the victim wanted an intimate relationship with Petitioner. Petitioner was interviewed, a polygraph was administered, and he eventually confessed to the crime, telling police about the friend who had hidden the weapon for him. (*Id.* at 2.)

Petitioner was then arrested on charges of first degree murder.

## B. PROCEEDINGS AT TRIAL

**Pre-Trial Proceedings** - Ultimately, an Indictment (Exhibit A) was issued against Petitioner, charging him with one count of first degree murder.  Trial counsel filed a Motion to Suppress (Exhibit C), arguing that Petitioner had not been *Mirandized* prior to his confession.  The trial court ruled that Petitioner had validly waived his rights for the polygraph examination, but had not been advised of nor waived his *Miranda* rights prior to a subsequent custodial interrogation, although the statements were otherwise deemed voluntary.  Accordingly, the Court ruled that the later statements were admissible only for impeachment purposes in the event Petitioner testified.  (Exhibit E, M.E. 5/5/00.)

**Plea Agreement** - On May 12, 2000, a week after the court's ruling on the motion to suppress, the Petitioner entered into a written Plea Agreement (Exhibit F).  That plea agreement provided for Petitioner to plead guilty to one count of manslaughter, in violation of Ariz. Rev. Stat. § 13-1103(A)(2), which carried "a minimum sentence of 7 years, a presumptive sentence of 10.5 years; and a maximum sentence of 21 years."  There was no stipulation, however, as to the sentence to be imposed, which was "left to the discretion of the Court."  (*Id.* at 1.)  Petitioner entered his change of plea the same day, which was accepted.  (Exhibit G, M.E. 5/12/00.)

Although the written plea agreement did not provide a factual basis, the following factual basis was provided by the prosecution at the change of plea hearing:

> MR. LARSEN [Prosecutor]: The body of Lamont Lattery was found on October 5th of 1999 near the Little America Hotel off of Butler Road in a wooded area in east Flagstaff, Arizona.  Lattery had apparently been killed by one gunshot wound to the upper chest area.
> A Flagstaff Police Department investigation revealed that Kyle DeBerry killed Lamont Lattery on October 5th of 1999.  The body was found at the same location where the shooting was done.  DeBerry admitted to Ron Schmenk, an independent polygrapher for the Flagstaff Police Department, that he had shot Lattery because lattery had apparently been following DeBerry around and apparently had parked near DeBerry's parents' house and watched the house a few days before the shooting.  DeBerrry had apparently also received a phone call message from the victim on the same day of the shooting which apparently used profanity and demeaning language towards DeBerry, and that apparently provoked DeBerry and led him to load his .45 caliber black powder pistol gun and request a meeting with Lamont Lattery.

DeBerry called Lattery back and arranged to meet near the Little America Hotel in east Flagstaff.  DeBerry and Lattery encountered each other in the wooded area near the hotel and apparently had some conversation about the phone message that was left at the DeBerry house.  Deberry was apparently unsettled that Lattery was possibly spreading false rumors about him and following him around.

After some further short remarks, DeBerry raised his preloaded gun and shot Lattery in the upper chest area.  Lattery died shortly thereafter.  A later autopsy performed by Dr. Joe Dressler revealed that Lattery had died because of a gunshot wound to the upper chest area.

The offense is dangerous because Mr. Kyle DeBerry used a deadly weapon which was the .45 black powder pistol - - .45 caliber black powder pistol.  And all events occurred within Coconino County.

THE COURT: All right.  Thank you.  And this is designated as a dangerous but nonrepetitive offense.

Mr. Griffen, do you agree there is a factual basis for this plea?

MR. GRIFFEN [Defense Counsel]: Judge, we do. Just to further perhaps comment, we agree that the shooting took place as a result of an ongoing problem that developed by Mr. Lattery stalking and continuing to sexually pursue Mr. DeBerry; that Mr. DeBerry had made clear that he wanted no part of that but, nonetheless, that continued, it continued to escalate; Mr. Lattery was unceasing in his pursuits of Mr. DeBerry, threatening both sexually and physically to Mr. DeBerry. Lesser forms of trying to get Mr. Lattery to cease his behavior were not successful.

There is a lot of evidence that demonstrates that Mr. Lattery had threatened to break every bone in Mr. DeBerry's body, had threatened him sexually repetitively, both over the phone, in person, and by written letter, which we will produce at the appropriate hearing; that many third parties heard the threats or are aware of the danger that was posed by Mr. Lattery to Mr. DeBerry; that Mr. DeBerry believed Mr. Lattery because of his personal observations was armed with a weapon; that in the past Mr. Lattery had tried to injure Mr. DeBerry physically; that Mr. Lattery had a reputation for being willing to resort to physical violence.  For all those reasons and for the other reasons identified by the state with the immediate phone call preceding this situation which threatened Mr. DeBerry with sexual injury and other problems the confrontation occurred.  Mr. DeBerry, in essence, became overwhelmed with the provocation that had escalated and lost control and did commit the shooting.  More evidence on that will be presented at a mitigation hearing.

THE COURT: All right.  Thank you.  You've explained the elements of the offense of manslaughter — felony two manslaughter to your client?

MR. GRIFFEN: I have.

(Exhibit H, R.T. 5/12/00 at 10-11.)

**Sentencing** - The matter was set for sentencing, and the state filed an "Aggravation Hearing Memorandum" (Exhibit I.)  The state argued that "Lamont Lattery had provoked the

1    defendant to kill him, and that the provocation was so extreme as to deprive a reasonable

2    person of self-control." (*Id.* at 3.)  However, the prosecution then proceeded to attack the

3    factual basis of the claimed provocation by highlighting Petitioner's: initial denial of

4    responsibility, disdain of the victim's homosexuality, and failure to render aid after shooting

5    the victim.  The state argued that the "court should find as an aggravating factor that the

6    defendant lost control and killed the victim after provocation that barely meets the statutory

7    test." (*Id.* at 13.)  The state went on to argue that the provocation was based on an offensive

8    phone message that only defendant heard, and police were unable to locate, included

9    accusations of being gay and using drugs, which accusations were otherwise know to

10   Petitioner's family, and which in any event "could not justify shooting the caller." (*Id.* at

11   14.)

12          In addition, the prosecution indicated its desire to leverage Petitioner's references to

13   the excluded statement to the police to establish "defendant's lack of remorse, premeditation,

14   knowledge that he was killing an unarmed man, lying in wait, cruelty towards the victim as

15   he was dying, and disposal of the weapon." (*Id.* at 5-6.)  To support aggravation on the basis

16   that the crime was committed in an "especially heinous, cruel or depraved manner," the state

17   argued that

18           Although DeBerry claims to have been provoked to a level which
             would have deprived a reasonable person to lose control, he made no
19           effort to get medical assistance for Lattery after he regained control.
                    There is no evidence that Lattery was armed or that there was a
20           struggle or any physical force used by Lattery.  DeBerry shot and killed
             an unarmed defenseless man."
21

22   (*Id.* at 10.)  The state further argued that the sentence should be aggravated because, *inter*

23   *alia*: (1) "the motive for the homicide was that the victim was homosexual"[1]; (2) Petitioner

24   was addicted to methamphetamine; and (3) Petitioner's lack of remorse as shown by

25   Petitioner's interview. (*Id.* at 11-14.)  The state did proffer that Petitioner's drug use was a

26

27          [1] In his sentencing memorandum, Petitioner argued that the prosecutor was confusing
     sexual preference with sexual misconduct motivated by that preference. (Exhibit J at 10,
28   n.3.)

1   mitigating factor, but then argued that it should not be a substantial one because of

2   Petitioner's habitual use and desire to support that habit by manufacturing his own drugs. (*Id.*

3   at 14-16.)

4          A three day sentencing hearing was conducted.  (Exhibits K, R.T. 6/13/00; L, R.T.

5   6/14/00; and M, R.T. 6/15/00.)  At the conclusion of the sentencing hearing, the prosecution

6   repeated its attack on the provocation defense:

7                  MR. HORLING [Prosecutor]: . . . .And I want to start by talking
              about the issue of provocation which, as the Court is aware under the
8              manslaughter subsection that has been pled to here is already part of the
              plea.  And much of what's happened in the last three days is that you're
9              being asked to give the defendant a second break because of any
              provocation by Lamont Lattery, in effect, to allow the defense to
10             double-dip because of the facts that have been put forward by the
              defense.
11                            * * *
12                  And I hope the court will focus also, in considering
              second degree murder, loss of control on sudden quarrel or impulse.
13             And the unusual fact here that what's being bootstrapped into a
              justification is a - - not a conversation face to face, it's not a
14             conversation over the phone, it's a message left on an answering
              machine.  And so the question is, how long did Mr. DeBerry have to
15             regain control? . . . he had three and a half hours to cool off, erase that
              message, and think of a better alternative.

16   (Exhibit M, R.T. 6/15/00 at 79-82.)  The prosecution also argued again, *inter alia*, that the

17   killing was motivated by the victim's sexual orientation (*id.* at 96), and that Petitioner

18   showed a lack of remorse (*id.* at 99-101).

19          In response, trial counsel argued that the state was undermining the terms of the plea

20   agreement, referencing "*Santa Bella*."  (*Id.* at 103-105.)

21                  So, today, having the state agree to the fact that it's a
              manslaughter case, for whatever reason now wants to publicly
22             acknowledge to anyone who wants to listen, for them to walk in here
              and say it's aggravated because it's barely a manslaughter case is
23             illegitimate, disingenuous, and just plain sad because that's not the
              case. You know, two parties walked in here, shook hands, and said, it's
24             a manslaughter, and now today we don't want to call it that. We want
              to heighten the punishment and associate it with something like first or
25             second degree, and it's not and it never was.  And for the state, in its
              memorandum, to suggest that this is an aggravated sentence because
26             it's barely provocation, I beg to differ.  You know, if you reach an
              agreement, reach an agreement.
27                            * * *
                  You know, provocation by definition is that it deprives a
28             reasonable person of self-control.  If he's a defective person, so be it,

and he has a problem with ADHD and some other problems.  But the agreement here was that it deprives a reasonable person, an objective person of self-control.  To come in here and try and undermine that and say the provocation wasn't that great, it just belies the truth.

\* \* \*

The provocation was the basis upon which the case was resolved and it cannot be taken away and it cannot be minimized.

\* \* \*

I want to talk about double-dipping, the claim that the provocation that got us here ends here and cannot be considered by the Court in quantity or quality in terms of fashioning the appropriate sentence.  You know I frankly don't care whether you double-dip or you take one big dip, but one big dip here exists.

\* \* \*

But I think it does an injustice to undo the deal and forget about the provocation . . .

(*Id.* at 103-113.)

In sentencing Petitioner, the trial court acknowledged that the case was one of manslaughter committed by "committing second degree murder upon sudden quarrel or heat of passion resulting from adequate provocation by the victim."  (*Id.* at 124.)  The court acknowledged that manslaughter was the offense to which Petitioner had plead, that it was the offense reflected in the proffered factual basis, and that "there was clearly, no matter how constricted the facts, the state and the defense placed a substantial factual basis showing that there was - - - that this was a manslaughter case."  (*Id.* at 125.)  The trial court refused, however, to "double-dip, if you will - - I think that was the term that's been used - - on either side."  (*Id.* at 131.)

The trial court then proceeded to recognize as aggravating factors: (1) the "emotional and financial harm. . . that was caused to the victim's family" (*id.* at 132); (2) the lack of remorse based upon evidence that Petitioner continued to believe the killing was justified (*id.* at 132-133); and (3) Petitioner's drug use (*id.* at 133).  The trial court found as a mitigating factor the lack of any prior convictions.  (*Id.*)

After weighing the aggravating and mitigating circumstances, the court sentenced Petitioner to an aggravated, but less than maximum, term of 16 years in prison.  (*Id.* at 135.)

//

//

**C.  PROCEEDINGS ON DIRECT APPEAL**

Having entered a guilty plea, Petitioner was not entitled, under Arizona law, to a direct appeal. Ariz. Rev. Stat. § 13-4033(B).  No direct appeal was filed.


**D.  PROCEEDINGS ON POST-CONVICTION RELIEF**

Petitioner, through counsel, filed a Petition for Post-Conviction Relief, arguing: (1) that his due process rights were violated when the prosecution violated the plea agreement by arguing that adequate provocation did not exist (Exhibit N at 1, 27-29); and (2) the court (a) failed to consider Petitioner's mitigating circumstances and (b) found an impermissible aggravating factor in Petitioner's lack of remorse and impairment from his ADHD and drug usage, in violation of Petitioner's due process rights (*id.* at 1, 29-37) .

The PCR court[2] found  that the agreement on provocation was honored, and that the parties merely argued "the amount of provocation, not whether provocation existed." (Exhibit P, M.E. 11/7/01 at 1.)  On the other hand, the court found that even if lack of remorse was a proper aggravating circumstance, the record did not support a finding of lack of remorse, and that impairing drug use is a mitigating factor, and that the record did not support a finding that it was a proper aggravating factor.  The court declined to address the failure to consider mitigating evidence.  The sentence was vacated the matter set for re-sentencing.  (*Id.* at 2.)

Prior to re-sentencing, the state petitioned the Arizona Court of Appeals for review. (Exhibit Q.)  Petitioner responded through counsel, arguing *inter alia* that consideration of remorse was a violation of his Fifth Amendment rights to remain silent at sentencing (Exhibit R at 9).  However, much of Petitioner's response was based upon the assertion that the state was improperly arguing the correctness of the sentencing court's original decision, rather than the appropriateness of the PCR court's determination that the record did not support

---

[2] The sentence was pronounced by Hon. Robert B. Van Wyck. (*See* Exhibit M, R.T. 6/15/00.)  The PCR petition was decided by Hon. Danna D. Hendrix.  (*See* Exhibit P, M.E. 11/7/01).

1    those decisions.

2         Petitioner also filed a Cross-Petition for Review, arguing that the PCR court erred in

3    rejecting his assertion that the State breached the plea agreement by arguing provocation, "in

4    violation of his right to due process under the Fifth and Fourteenth Amendments to the U.S.

5    Constitution." (Exhibit S at 2.)

6         On December 6, 2002, the Arizona Court of Appeals issued its Memorandum

7    Decision (Exhibit U)[3], upholding the PCR Court's rejection of the claim of breach of the plea

8    agreement, but reversing the decision on the lack of remorse and drug use. The grant of the

9    Petition for Post-Conviction relief was vacated, and the original sentence was reinstated.

10        **Arizona Supreme Court** - Petitioner then filed, through counsel, a Petition for

11   Review by the Arizona Supreme Court (Exhibit V). That petition was limited to arguing that

12   (1) the lack of remorse was not a proper aggravating circumstance under the 5th Amendment;

13   (2) consideration of Petitioner's drug addiction as an aggravating circumstance was a

14   violation of Petitioner's due process rights under the 14th Amendment; and (3) the trial court

15   abused its discretion by failing to consider the proffered mitigation.

16        On May 3, 2003, the Arizona Supreme Court summarily denied review. (Exhibit X,

17   Order 5/30/03.)

18

19   **E.  SECOND PCR PROCEEDING**

20        **Trial Court** - As discussed hereinafter, on November 4, 2004, during the pendency

21   of this federal habeas proceeding, Petitioner filed a second PCR Petition. (Exhibit 1 to

22   Supplemental Answer, #54.) (Exhibits to the Supplemental Answer, #54, are referenced

23   hereinafter as "Supplemental Exhibit ____.) Petitioner's second PCR petition asserted

24   claims pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*,

25   542 U.S. 296 (2004) (decided June 24, 2004), arguing that he was denied his Sixth

26   Amendment right to trial by jury when his sentence was aggravated based on facts neither

27   _____

28        [3]  The copy of the 2002 Memorandum Decision attached to the Answer, #9 appears incomplete. A complete copy is attached to the Traverse, #57 as Exhibit K.

1   determined by a jury nor admitted by Petitioner, and that his original PCR counsel was

2   ineffective for failing to raise a claim under *Apprendi.*  Petitioner raised similar state law

3   claims.

4            The trial court denied relief on May 10, 2005, finding that *Blakely* was not

5   retroactively applicable and Petitioner's first PCR petition became final when the Arizona

6   Supreme Court denied review.  The trial court found no ineffective assistance of counsel of

7   trial counsel, because *Blakely* was decided long after Petitioner's sentencing, and therefore

8   trial counsel was not deficient, and that the failure did not, in any event, effect the outcome

9   of the case.  (Supplemental Exhibit 2, M.E. 5/10/05.)

10           **Arizona Court of Appeals** - Petitioner filed, through counsel, a Petition for Review

11  by the Arizona Court of Appeals (Supplemental Exhibit 3).  Petitioner argued that *Blakely*

12  applies to his case because it is merely a clarification of *Apprendi* which was decided while

13  his first PCR petition was pending, which was the equivalent of direct appeal for retroactivity

14  purposes.  Therefore, not only was Petitioner entitled to application of *Blakely*, but PCR

15  counsel was ineffective for failing to assert the claim.

16           The state responded that *Blakely* was not retroactively applicable to cases on collateral

17  review, and that Petitioner's conviction became final on entry of sentence on June 15, 2000.

18  The state argued that Petitioner could not show ineffective assistance of counsel because

19  Petitioner's sentence was final before *Apprendi* had been extended by *Blakely*.

20  (Supplemental Exhibit 4.)

21           On April 27, 2006, the Arizona Court of Appeals summarily denied review.

22  (Supplemental Exhibit 5, Order 4/27/06.)

23           **Arizona Supreme Court** - On May 26, 2006, Petitioner filed a Petition for Review

24  by the Arizona Supreme Court, seeking review of the same issues raised to the Arizona Court

25  of Appeals.  (Supplemental Exhibit 6.)  The Arizona Supreme Court summarily denied

26  review on October 12, 2006.  (Supplemental Exhibit 7.)

27  / /

28  / /

1    **E.  PRESENT FEDERAL HABEAS PROCEEDINGS**

2          **Original Petitions and Stay** - Petitioner commenced this federal habeas proceeding

3    by filing his original Petition (#1) on April 26, 2004.  Respondents subsequently Answered

4    (#9), and then on November 3, 2004, Petitioner filed an unopposed Motion to Amend and

5    to Stay (#15), seeking to exhaust his state remedies on his *Apprendi / Blakely* claims.  That

6    motion was granted (Order 11/10/4, #16), and on November 17, 2004, Petitioner filed his

7    First Amended Petition (#21).

8          Petitioner proceeded with his state remedies, filing monthly status reports from

9    November, 2004 through October, 2006, when Petitioner advised (#46) the Court that his

10   Petition for Review to the Arizona Supreme Court had been denied. The stay of the case was

11   terminated (Order 11/22/06, #47), and a schedule was set for further briefing (Order 1/16/07,

12   #50).

13         **Current Petition** - On February 16, 2007, Petitioner filed his Third Motion to Amend

14   (#52) and lodged his Second Amended Petition (#53).  The parties proceeded with briefing

15   on the basis of the Second Amended Petition, prior to the Court's ruling on the motion to

16   amend.   Eventually, however, on May 4, 2007, the motion was granted (#59), and

17   Petitioner's Second Amended Petition (#60) was filed on May 8, 2007.

18         Petitioner's Second Amended Petition asserts, in three grounds for relief, the

19   following claims:

20         1(a).   **Failure to Consider Mitigation** - The sentencing court's failure to consider

21                 mitigating evidence of Petitioner's ADHD condition and drug usage and

22                 addiction violated Petitioner's due process rights under the 14th Amendment.

23                 (Second Amended Petition, #60 at 1.)

24         1(b).   **Aggravation Based on Lack of Remorse** - The sentencing court violated

25                 Petitioner's right to silence by aggravating his sentence based on post-charging

26                 silence as indicative of a lack of remorse.  (*Id.*)

27         1(c).   **Aggravation Based on Drugs** - The sentencing court's consideration of

28                 Petitioner's drug use and addiction as an aggravating factor, rather than a

- 11 -

mitigating factor, was a violation of state law and a denial of due process. (*Id.*)

2. **Plea Agreement Breached** - Petitioner's due process rights were violated when the prosecution breached the pleas agreement by: (a) after inducing Petitioner to plead guilty on the basis that the manslaughter was based on adequate provocation, the prosecution then argued at sentencing a lack of provocation; and (b) the prosecution referred to second degree murder as part of its sentencing argument, in violation of the plea agreement. (*Id.* at 6.)

3(a). ***Blakely* Violation** - Petitioner's jury trial right, as determined in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004), was violated when the sentencing court aggravated his sentence based on aggravating factors not found by a jury or admitted by Petitioner, including inadequate remorse and drug use, and the Arizona Courts improperly failed to apply these cases to him in his first post-conviction relief petition. (*Id.* at 7-7a.)

3(b). **Ineffective Assistance in Rule 32 Proceeding** - Petitioner received ineffective assistance of counsel in his first Rule 32 proceeding, when counsel failed to object to the judicial fact-finding of aggravating circumstances. (*Id.*)

**Answer and Supplemental Answer** - On August 12, 2004, Respondents filed their Answer (#9) to the original Petition (#1). Respondents' Supplemental Answer (#54) continues to rely upon this original Answer to respond to the first two grounds for relief (Claims 1-6) which have been carried forward from the original Petition. In response to the claims, Respondents argue:

1(a). **Failure to Consider Mitigation** - Petitioner failed to present this claim as a federal claim and thus failed to exhaust his state remedies with respect to Claim 1(a), and it is now procedurally defaulted. (Answer, #9 at 22-23.) Further the claim is a state law claim not cognizable on habeas review (*id.* at 23-24) and is without merit (*id.* at 25-26).

1(b). **Aggravation Based on Lack of Remorse** - Respondents argue that this claim

- 12 -

1    is without merit.  (*Id.* at 44-53.)

2    1(c).   **Aggravation Based on Drugs** - Petitioner failed to present this claim as a

3    federal claim and thus failed to exhaust his state remedies with respect to

4    Claim 1(c), and it is now procedurally defaulted.  (Answer, #9 at 22-23.)

5    Further the claim is a state law claim  not cognizable on habeas review.  (*Id.*

6    at 23-24.)

7    2.   **Breach of Plea Agreement** - Respondents characterize Petitioner's Ground

8    Two as asserting a claim: (a) that the prosecution breached the plea agreement;

9    and (b) that the trial court improperly treated his lack of remorse as an

10   aggravating factor.  Respondents concede exhaustion of the latter, but not the

11   former. (*Id.* at 31.)  With regard to the breach claim, Respondents argue that

12   the state court's finding that there was no agreement on the degree of

13   provocation is supported by the record, and the state courts properly applied

14   federal law.  (*Id.* at 34-43.)  With regard to the remorse claim, Respondents

15   argue that the courts properly applied federal law.  (*Id.* at 44-53.)

16   On March 16, 2007, Respondents filed their Supplemental Answer (#54), addressing

17   the new claims set forth in Petitioner's Ground Three, identified herein above as Claims 3(a)

18   and (b).  Respondents concede that these grounds are now properly exhausted, but assert that

19   they are without merit because: (1) *Blakely* was not retroactively applicable to Petitioner

20   because it announced a new rule of procedural law, and Petitioner's conviction became final

21   on his sentencing as a result of his waiver of his direct appeal rights; (2) although *Apprendi*

22   applied to Petitioner's sentence, *Apprendi* did not mandate the result Petitioner seeks; (3)

23   *Blakely* does not apply because Petitioner admitted one of the three aggravating factors,

24   which was all that was necessary to authorize the aggravated sentence; (4) any error was

25   harmless because overwhelming evidence established at least one of the three aggravating

26   factors; (5) Petitioner had no right to counsel, effective or otherwise,  in his PCR

27   proceedings; and (6) counsel cannot be found deficient for having failed to predict *Blakely*;

28   **Traverse** - On April 12, 2007, Petitioner filed his Traverse (#57) and on April 13,

1  2007 his *Errata* re Traverse (#58).  In his Traverse, Petitioner argues that all of his claims

2  were properly exhausted, and are all meritorious.

3

4  ### III. APPLICATION OF LAW TO FACTS

5  ### A.  FAILURE TO CONSIDER MITIGATION (Ground 1(a))

6      In his first ground for relief, Petitioner argues that his due process rights were violated

7  when the sentencing court failed to consider as mitigating evidence his ADHD condition, and

8  his drug usage and addiction . (Second Amended Petition, #60 at 1.)

9      Respondents argue that Petitioner failed to present this claim as a federal claim and

10  thus failed to exhaust his state remedies, and it is now procedurally defaulted.  (Answer, #9

11  at 22-23.)   Respondents further argue that the claim is a state law claim not cognizable on

12  habeas review (*id.* at 23-24) and is without merit (*id.* at 25-26).

13      Petitioner replies that he fairly presented this as a federal claim in his original PCR

14  Petition, and that the claim establishes not a mere state law violation but a denial of liberty

15  without due process of law.  (Traverse, #57 at 11-14.)

16

17  **1.  Exhaustion of State Remedies**

18      Generally, a federal court has authority to review a federal constitutional claim

19  presented by a state prisoner only if available state remedies have been exhausted.

20  *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)(per curiam). The exhaustion doctrine, first

21  developed in case law, has been codified at 28 U.S.C. § 2254.  To result in exhaustion, claims

22  must be "fairly presented."  That is, the habeas petitioner must provide the state courts with

23  a "fair opportunity" to apply controlling legal principles to the facts bearing upon his

24  constitutional claim.  28 U.S.C. § 2254; *Picard v. Connor*, 404 U.S. 270, 276-277 (1971).

25  A claim has been fairly presented to the state's highest court if petitioner has described both

26  the operative facts and the federal legal theory on which the claim is based.  *Kelly v. Small*,

27  315 F.3d 1063, 1066 (9th Cir. 2003).

28      Moreover, "to exhaust one's state court remedies in Arizona, a petitioner must first

raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court. This is true even where alternative avenues of reviewing constitutional issues are still available in state court. *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989).

**Presentation of Petitioner's Claims re Mitigation** - Here, Petitioner argues that he presented his failure to mitigate claims in his PCR Petition to the trial court. Indeed, he did argue to the trial court that "[t]he sentencing court failed to consider the substantial mitigation presented by Petitioner . . . in violation of his rights under the 5th, 6th and 14th Amendments to the United States Constitution." (Exhibit N, PCR Petition at 2.) Petitioner argued that the evidence established and the trial court erred in failing to consider as mitigation the fact that he had "Attention Deficit Hyperactivity Disorder" ("ADHD"), was addicted to methamphetamine, and was under the influence at the time of the killing. (*Id.* at 34-35.)

However, presentation to the trial court is not sufficient. Rather, Petitioner must show that he presented this claim at least to the Arizona Court of Appeals. *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005). Petitioner's Response to the state's petition for review was limited to arguing the propriety of the PCR court's vacating of the sentence on the basis of the unsupported aggravating factors. (Exhibit R, Response at 4.) His Cross-Petition for Review was limited to arguing that the PCR court improperly rejected his claim that the plea agreement had been breached by the prosecution's arguments on provocation. (Exhibit S, Cross-Petition at 16.) Thus, Petitioner did not present his mitigation claims to the Court of Appeals.

It is true that in his petition to the Arizona Supreme Court, Petitioner argued that: (A) the Court of Appeals had erred in reversing the PCR court's grant of relief on his aggravation claims (Exhibit V, Petition at 1, 3); (B) that he was denied due process of law under the U.S.

1    Constitution when the trial court failed to mitigate on the basis of his drug usage, and instead

2    treating it as an aggravating factor (*id.* at 9); and (C) that the trial court abused its discretion

3    by failing to consider mitigation evidence concerning his ADHD and drug use (*id.* at 12).

4    Thus, it is clear that Petitioner presented his due process claim on his drug usage to the

5    Arizona Supreme Court as part of his claim (B).[4]

6         However, having skipped the presentation of this claim to the Arizona Court of

7    Appeals, Petitioner's presentation to the Arizona Supreme Court is not sufficient to exhaust

8    his remedies. "Whether a claim is exhausted through a direct appellate procedure, a post-

9    conviction procedure, or both, the claim should be raised at all appellate stages afforded

10   under state law as of right by that procedure."  *Casey v. Moore,* 386 F.3d 896, 916 (9th Cir.

11   2004) (quoting Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure,* § 23.3b

12   (4th ed. 1998) ).  "[W]here the claim has been presented for the first and only time in a

13   procedural context in which its merits will not be considered unless 'there are special and

14   important reasons therefor' . . . [r]aising the claim in such a fashion does not, for the relevant

15   purpose, constitute 'fair presentation.'"  *Castille v. Peoples,* 489 U.S. 346, 351 (1989).  Thus,

16   where a petitioner "raised his federal constitutional claims for the first and only time to the

17   state's highest court on discretionary review, he did not fairly present them."  *Casey,* 386

18   F.3d at 918.

19        In Arizona, review of a PCR Petition by the Arizona Supreme Court is governed by

20   Ariz. R.Cr. P. 31.19.  *See* Ariz. R. Cr. P. 32.9(g).  That rule makes clear that a grant of review

21   is discretionary, and requires a showing of reasons for granting review, such as "the fact that

22   no Arizona decision controls the point of law in question, that a decision of the Supreme

23   Court should be overruled or qualified, that conflicting decisions have been rendered by the

24   Court of Appeals, or that important issues of law have been incorrectly decided."  Ariz. R.Cr.

25

26        [4]  Respondents argue that the drug usage claim was not adequately presented as a
     federal claim because it was made only by a bare reference to due process.  (Answer, #9 at
27   25, n. 7.)  In support of this argument, Respondents point to Petitioner's PCR Petition.
     However, exhaustion is not established by presentation to the PCR Court, but to the appellate
28   courts.

1    P. 21.19(c)(3).  Thus, just as in *Castille* and *Casey*, Petitioner's failure to present his claims

2    to the intermediate appellate court precludes a finding that it has been fairly presented.

3        <u>Presentation of ADHD Claim</u> - Petitioner also plainly did not present to the Arizona

4    Court of Appeals his due process claim on his ADHD.  It is less clear whether he presented

5    this claim to the Arizona Supreme Court.  It is true that his claim (C) to the Arizona Supreme

6    Court contained the same factual background as Petitioner's current claim on the failure to

7    mitigate on the basis of his ADHD.  However, a claim has been fairly presented only if a

8    petitioner has described both the operative facts *and* the federal legal theory on which the

9    claim is based.  *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003).  It is not enough that a

10   "somewhat similar state-law claim was made."  *Anderson v. Harless*, 459 U.S. 4, 6

11   (1982)(per curiam).  Indeed, it is not enough "to raise a state claim that is analogous or

12   closely similar to a federal claim."  *Castillo*, 399 at 999.  Petitioner's third claim for relief

13   to the Arizona Supreme Court argued no federal law in making the argument on the failure

14   to mitigate on the basis of his ADHD, citing only State statutes and cases.

15       And, while Petitioner's presentation of his federal claims to the trial court would have

16   been part of the record before the Arizona Supreme Court, "a state prisoner does not 'fairly

17   present' a claim to a state court if that court must read beyond a petition or a brief (or a

18   similar document) that does not alert it to the presence of a federal claim in order to find

19   material, such as a lower court opinion in the case, that does so."  *Baldwin v. Reese*, 541 U.S.

20   27, 32 (2004).  The habeas petitioner "must have presented his federal, constitutional issue

21   before the Arizona Court of Appeals within the four corners of his appellate briefing."

22   *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005).[5]

23

24       [5] It is true that "a citation to a state case analyzing a federal constitutional issue serves
     the same purpose as a citation to a federal case analyzing such an issue."  *Peterson v.*
25   *Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003).  However, none of the state authorities cited
     by Petitioner to the Arizona Supreme Court on his third claim for relief were founded on
26   federal law. *See State v. Harrison,* 195 Ariz. 1, 985 P.2d 486 (1999) (based on state law and
     state statute analysis); *State v. Murray,* 184 Ariz. 9, 906 P.2d 542 (1995) (same); *State v.*
27   *Gretzler,* 135 Ariz. 42, 659 P.2d 1(1983) (same); and *State v. Ramirez,* 178 Ariz. 116, 871
     P.2d 237 (1994) (same).

Finally, in making his claim (B), concerning his drug usage, Petitioner also argued that the evidence reflected his ADHD condition and its effect on his susceptibility to provocation and ability to control his behavior. (Exhibit V at 10.) The substance of that claim (B), however was limited to arguing the failure to consider the drug use and addiction. The caption of the claim and the argumentative sections are limited to that claim, and the only references to Petitioner's ADHD are presented in such a fashion as to be merely part of the *res gestae*, not a separate basis for mitigation. The federal nature of claims does not bleed from one to the next.

> Moreover, citation of a relevant federal constitutional provision in relation to some other claim does not satisfy the exhaustion requirement. Recently, the Supreme Court, reversing our court, concluded that a petitioner had failed to exhaust his available state remedies when he referenced the Sixth Amendment in relation to his claim that trial counsel was ineffective, but failed to reference it again in respect to his separate claim for ineffective assistance of appellate counsel.

*Castillo,* 399 F.3d at 999.

Thus, the undersigned finds that Petitioner did not present to either the Arizona Court of Appeals or the Arizona Supreme Court his due process claim based on the failure to mitigate on the basis of his ADHD status. Accordingly, that portion of Petitioner's Ground One has not been properly exhausted.

Ordinarily, this Court would be obligated to dismiss this unexhausted claims without prejudice, to allow Petitioner to exhaust his state remedies. However, Respondents argue that dismissal with prejudice is required, because Petitioner has procedurally defaulted on his unexhausted claims.

## 2. Procedural Default of Drug Usage and ADHD Claim

Respondents argue that Petitioner is now prohibited from asserting his unexhausted claims by Arizona Rule of Criminal Procedure 32.2, which precludes post-conviction relief based on grounds waived in a previous proceeding.

As an alternative to presenting his claims to the highest state court, a petitioner can

satisfy the exhaustion requirement by demonstrating that no state remedies remained available at the time the federal habeas petition was filed. 28 U.S.C. § 2254(b)(1)(B); *Engle v. Isaac*, 456 U.S. 107, 125 (n. 28)(1982); *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989). If, however, the procedural bar is of the petitioner's own making, then he may be precluded from seeking habeas relief.

> If state remedies are not available because the petitioner failed to comply with state procedures and thereby prevented the highest state court from reaching the merits of his claim, then a federal court may refuse to reach the merits of that claim as a matter of comity.

*Buffalo v. Sunn*, 854 F.2d 1158, 1163 (9th Cir. 1988). This failure to comply with reasonable state procedures is usually characterized as "procedural default". When a petitioner has "procedurally defaulted", his claim is barred absent a showing of "cause and prejudice" sufficient to excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Petitioner does not challenge (assuming the claim is unexhausted) that the claim is now procedurally defaulted. Indeed, Rule 32.2(a)(3), Arizona Rules of Criminal Procedure, precludes relief "based upon any ground . . . [t]hat has been waived at trial, on appeal, or in any previous collateral proceeding." In *Stewart v. Smith,* 202 Ariz. 446, 46 P.3d 1067 (2002), the Arizona Supreme Court recognized that except for claims of "sufficient constitutional magnitude", the State may establish preclusion under Rule 32.2 by simply showing "that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding." *Id.* at 449, 46 P.3d at 1070. Petitioner does not assert that his due process claim would be of "sufficient constitutional magnitude" so as to require something more than a mere failure to raise the claim for it to be precluded. Accordingly, the undersigned concludes that Petitioner's Ground 1 would be precluded under Rule 32.2(a)(3).

Moreover, under Ariz.R.Crim.P. 31.3, the time for filing a direct appeal expires twenty days after entry of the judgment and sentence. The Arizona Rules of Criminal Procedure do not provide for a successive direct appeal. *See generally* Ariz.R.Crim.P. 31. Accordingly, direct appeal is no longer available for Petitioner's unexhausted claims.

Likewise, Petitioner can no longer seek review by a subsequent PCR Petition.

Ariz.R.Crim.P. 32.4 requires that petitions for post-conviction relief (other than those which are "of-right") be filed "within ninety days after the entry of judgment and sentence or within thirty days after the issuance of the order and mandate in the direct appeal, whichever is the later."   *See State v. Pruett*, 185 Ariz. 128, 912 P.2d 1357 (App. 1995) (applying 32.4 to successive petition, and noting that first petition of pleading defendant deemed direct appeal for purposes of the rule).   That time has long since passed.

While Rule 32.4(a) does not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h), Petitioner has not asserted that any of these exceptions are applicable to his equal protection claim.   Nor does it appears that such exceptions in Rule 32.1 would apply to this claim.   The rule defines the excepted claims as follows:

> d. The person is being held in custody after the sentence imposed has expired;
> e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
> (1) The newly discovered material facts were discovered after the trial.
> (2) The defendant exercised due diligence in securing the newly discovered material facts.
> (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.
> f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or
> g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or
> h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

Ariz.R.Crim.P. 32.1.

Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona prisoner who is simply attacking the validity of his conviction or sentence.  Where a claim is based on "newly discovered evidence" that has previously been presented to the state

courts, the evidence is no longer "newly discovered" and paragraph (e) has no application. Paragraph (f) has no application where the petitioner filed a timely notice of appeal, and the notice of post-conviction relief of-right applies only to first petitions filed within 90 days following a judgment based on a guilty or *nolo contendre* plea.  *See* Ariz.R.Crim.P. 32.1 (defining when petition of-right).  Paragraph (g) has no application because Petitioner has not asserted a change in the law occurring since his last state PCR petition.  Finally, paragraph (h) has no application to Petitioner's sentencing error claims.

Therefore, this claim must be found to be procedurally defaulted.

**Cause and Prejudice** - If the habeas petitioner has procedurally defaulted on a claim, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).  Petitioner has not asserted cause or prejudice to excuse his default.

**Actual Innocence** - The standard of "cause and prejudice" can apply where " a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  However, a petitioner asserting his actual innocence of the underlying crime must show "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence" presented in his habeas petition.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A showing that a reasonable doubt exists in the light of the new evidence is not sufficient.  Rather, the petitioner must show that no reasonable juror would have found the defendant guilty.  *Id.* at 329.  Petitioner has not attempted to make such a showing.

**Summary** - Plaintiff's Ground 1(a) was not properly exhausted and is now procedurally defaulted.  Accordingly, Ground 1(a) must be dismissed with prejudice.


**B. AGGRAVATION BASED ON LACK OF REMORSE**

For his Ground 1(b), Petitioner argues that his Fifth Amendment right to remain silent was violated when the sentencing court used Petitioner's silence as an indication of a lack of remorse, and used it as an aggravating factor   (Second Amended Petition, #60 at 1.)

1   Respondents argue that the claim is without merit.[6]   (*Id.* at 44-53.)

2

3   **1.  State Court's Consideration of Remorse Claim**

4          Petitioner presented his lack of remorse claim to the trial court, arguing that his 5th

5   Amendment right to remain silent was violated when the trial court aggravated his sentence

6   on the basis of a finding of lack of remorse.  In support of his arguments, Petitioner cited a

7   series of Supreme Court decisions, including *Mitchell v. United States*, 526 U.S. 314 (1999).

8   (Exhibit N, PCR Petition at 32-33.)  The PCR court found that the evidence did not support

9   the sentencing court's finding of a lack of remorse, and thus did not address Petitioner's

10  constitutional arguments.  (Exhibit P, M.E. 11/7/01 at 1-2.)

11         Petitioner then repeated his Fifth Amendment argument to the Arizona Court of

12  Appeals, again citing *Mitchell*.  (Exhibit R, Response at 9.)  That court rejected Petitioner's

13  argument, distinguishing an Arizona case on the issue, *State v. Tinajero*, 188 Ariz. 350, 935

14  P.2d 928 (App. 1997), on the basis that Petitioner had not asserted his innocence, but had

15  pled guilty.  (Exhibit U, Mem. Dec. 12/26/02 at 15-16.)

16         Finally, Petitioner repeated the argument to the Arizona Supreme Court, arguing that

17  the court's consideration of his lack of remorse was a denial of right to remain silent under

18  the Fifth Amendment to the United States Constitution.  (Exhibit V, Petition at 4, 6-8.)  The

19  claim was summarily denied.  (Exhibit X, Order 5/20/03.)  Consequently, the last reasoned

20  decision was that of the Arizona Court of Appeals, and it is that decision which is reviewed

21  by this habeas court.  "Before we can apply AEDPA's standards, we must identify the state

22  court decision that is appropriate for our review.  When more than one state court has

23  adjudicated a claim, we analyze the last reasoned decision."  *Barker v. Fleming,* 423 F.3d

24  1085, 1091 (9th Cir. 2005).

25  _____

26         [6] Respondents discuss authorities holding that lack of remorse is a proper aggravating
    factor.  (Answer, #9 at 48.)  Petitioner does not argue otherwise.  In any event, insofar as the
27  Arizona Court of Appeals concluded that, under Arizona state sentencing law, lack of
    remorse was a proper aggravating factor (*see* Exhibit U, Mem. Dec. at 15), that holding
28  would not be reviewable in this federal habeas proceeding.

**2. Arizona Court of Appeals Decision "Contrary To" Supreme Court Law**

As noted herein above, to be entitled to relief, Petitioner must show that the state court's decision was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. §2254(d)(1).

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

The essence of Petitioner's claim is that his right to remain silent was violated at sentencing; that he was penalized for refusing to express remorse for the death of the victim. The Arizona Court of Appeals rejected this claim based on a distinction between pleading defendants and defendants maintaining their innocence at trial.  In doing so, the state court distinguished *State v. Tinajero*, 188 Ariz. 350, 935 P.2d 928 (App. 1997). (Exhibit U, Mem. Dec. 12/26/02 at 15-16.)

In *Tinajero,* the defendant maintained his innocence at trial and through sentencing. The trial judge considered the defendant's maintenance of his claim of innocence to show a lack of remorse, and relied upon it as an aggravating factor.  The Arizona Court of Appeals held that "[w]hen a convicted person maintains his innocence through sentencing, as Tinajero did here, his failure to acknowledge guilt 'is irrelevant to a sentencing determination' and 'offends the Fifth Amendment privilege against self-incrimination.'" *Tinajero,* 188 Ariz. at 357, 935 P.2d at 935.

1    Undoubtedly, the Arizona Court of Appeals rightly distinguished the holding in
2  *Tinajero.*  Here, Petitioner had not maintained his innocence, but had openly admitted the
3  homicide.  In doing so, however, the Arizona Court of Appeals concluded that Petitioner's
4  guilty plea deprived him of Fifth Amendment protection, and thus the state court acted
5  "contrary to" the "clearly established Federal law, as determined by the Supreme Court of
6  the United States,"  28 U.S.C. §2254(d)(1), in *Mitchell v. United States*,  526 U.S. 314
7  (1999).

8    In *Mitchell,* the United States Supreme Court considered the right to remain silent at
9  sentencing following a guilty plea.  That case involved a federal criminal defendant who pled
10  guilty to drug charges, but refused to testify at sentencing to rebut the government's evidence
11  about drug quantity.  The trial court had ruled that the defendant had no right to remain silent
12  following her guilty plea, and relied on her refusal to testify in determining her sentence.
13  The court noted that "'[a]ny effort by the State to compel [the defendant] to testify against
14  his will at the sentencing hearing clearly would contravene the Fifth Amendment.' " *Id.* at
15  326 (quoting *Estelle v. Smith,* 451 U.S. 454, 463 (1981)).  Thus, the clear holding of *Mitchell*
16  is that a defendant's Fifth Amendment rights against self-incrimination survive a guilty plea
17  and continue to apply at sentencing.

18    The Arizona Court of Appeals acted contrary to *Mitchell* when it held that no Fifth
19  Amendment concerns were raised because Petitioner had pled guilty.  "[A] state court
20  decision is 'contrary to our clearly established precedent if the state court applies a rule that
21  contradicts the governing law set forth in our cases'." *Lockyer v. Andrade,* 538 U.S. 63, 73
22  (2003) (quoting *Williams*, 529 U.S. at 405-406).

23

24  **3.  Merits of Claim**

25    ***De Novo* Merits Determination Required** - While finding that a state court has acted
26  "contrary to" (or unreasonably applied) Supreme Court law is necessary to habeas relief, it
27  is not sufficient.  Rather, habeas relief for state prisoners is limited to those situations where
28  they are "in custody in violation of the Constitution or laws or treaties of the United States."

1    28 U.S.C. § 2241(c)(3).  The limitations of 28 U.S.C. § 2254(d)(1) require an error in

2    analysis by the state courts. § 2241 requires an error in the judgment.  "[S]tate-court

3    judgments must be upheld unless, after the closest examination of the state-court judgment,

4    a federal court is firmly convinced that a federal constitutional right has been violated."

5    *Williams*, 529 U.S. at 389 (Stevens, J. concurring).  Thus, this Court must still resolve

6    whether Petitioner's Fifth Amendment rights were violated.

7        In making this determination, § 2254(d)(1)'s deference to the state court's legal

8    analysis and the applicable law no longer applies, the state court not having made the

9    determination on the merits of Petitioner's claims.  "28 U.S.C. § 2254(d) applies only to

10   those claims that have been adjudicated on the merits. The requirement of an adjudication

11   on the merits . . .  means that the court must finally resolve the rights of the parties on the

12   substance of the claim." *Barker v. Fleming,* 423 F.3d 1085, 1092 (9th Cir. 2005).  "Because

13   the state court did not conduct the proper analysis, AEDPA's restrictions on our review do

14   not apply." *Id.* at 1095.  *See also Lewis v. Mayle,* 391 F.3d 989, 996 (9th Cir. 2004)  ("*De*

15   *novo* review, rather than AEDPA's deferential standard, is applicable to a claim that the state

16   court did not reach on the merits.") (distinguishing *Delgado v. Lewis*, 223 F.3d 976, 982 (9th

17   Cir.2000) ("where a state court provides no rationale for a decision, a habeas court does not

18   apply *de novo* review, but instead determines whether the state decision was 'objectively

19   unreasonable' based on its independent reading of the record") on the basis that the state

20   court in *Lewis* was not silent as to its reasoning; rather, it disposed of the claim on other

21   grounds.)

22       Therefore, this Court reviews *de novo* Petitioner's Fifth Amendment claim, "while

23   deferring to any factual findings made by the state court under 28 U.S.C. § 2254(e)(1)."

24   *Lewis*, 391 F.3d at 996.

25       **Trial Court's Reliance on Silence** - As noted above, Petitioner's claim is that his

26   silence was improperly relied upon to find a lack of remorse.  Here, the Arizona Court of

27   Appeals made no explicit finding on whether the trial court had relied upon Petitioner's

28   silence. The trial judge's explanation for his finding the lack of remorse certainly pointed to

- 25 -

evidence, other than Petitioner's silence, of a lack of remorse:

> I find as a second aggravating factor, again it's a substantial aggravating factor, that although I believe that Mr. DeBerry does - - Mr. DeBerry, you do have some real regret in regards to your family and in regard to - - ***The statements of the witnesses, also evidence that was presented, and even your own statement demonstrates to me*** even in regard to the Latterys. that still a large - - *-a piece of you now still says and has always said that it was justified* and that you had - - that he was - - he was after you and you shot. And the lack of remorse, if you will, I think is an appropriate factor. You cannot - - in order for you to responsibly begin - - not begin, but complete and really be rehabilitated, you must acknowledge your real responsibility in this and full responsibility and acknowledgment in this. And I find, even after your statements that, although, there - - - certainly you feel profoundly sad for your family and others, that your self-absorption is such that you see yourself as a victim of this in some ways and that you are not. So I find that as an aggravating factor.

(Exhibit M, R.T. 6/15/00 at 132-133 (emphasis added).)[7]

However, from this explanation by the trial judge of his sentence, it is also apparent that the sentencing judge based his aggravated sentence at least in part on his finding that Petitioner had not "acknowledged [his] real responsibility" but had instead "justified" his actions.

Petitioner interprets the trial judge's comments as a condemnation of the fact that Petitioner had not admitted he was not provoked. If Petitioner were correct, then the trial

---

[7] Respondents argue that the sentencing court could properly rely on evidence other than Petitioner's silence to find a lack of remorse, such as Petitioner's statements to the psychologist, to the presentence report writer, and the investigating officer. (Answer, #9 at 48-53.) Such an approach is permissible, even in a manslaughter case. *See e.g. Dallas v. Arave*, 984 F.2d 292 (9th Cir. 1993) (lack of remorse properly found from rough handling and hiding of victim's bodies after manslaughter). However, the undersigned does not understand Petitioner to challenge the court's use of such other evidence. Rather, Petitioner is challenging the trial court's reliance on his silence, in particular his failure to express remorse for the death of the victim. As noted by the Arizona Court of Appeals, "[a]lthough the defendant expressed remorse for the family of the victim and his own family and friends, he did not express remorse for Lamont's death." (Exhibit U, Mem. Dec. at 17.)

Further, the undersigned does not understand Petitioner to deny, in this proceeding, that there was not substantial evidence, other than his silence on the issue, to establish his lack of remorse. In deed, the Arizona Court of Appeals made factual findings of and catalogued a variety of evidence to support such a finding. Those findings are be entitled to substantial deference under 28 U.S.C. § 2254(d)(2) (only "unreasonable determination" justifies relief) and (e)(1) (presumption of correctness overcome only by "clear and convincing evidence").

judge would have violated Petitioner's right to remain silent by penalizing him for failing to admit uncharged conduct. The Ninth Circuit found just such conduct impermissible in *U.S. v. Mezas de Jesus,* 217 F.3d 638 (9th Cir. 2000). De Jesus was arrested and charged by state officials with kidnaping. The state charges were dropped and he was charged by federal officials with, and was convicted of being an undocumented immigrant in possession of a firearm. The district court enhanced De Jesus' sentence on the basis that the crime involved kidnaping. In doing so, the court noted the unreliability of the evidence of the kidnaping, but nonetheless found that it had occurred because De Jesus had failed to rebut the evidence. Relying on *Mitchell*, the Ninth Circuit held that "by implicitly drawing an adverse inference from the defendant's silence and looking to the defendant to testify at sentencing against his will, the court violated Mezas de Jesus's Fifth Amendment privilege against self-incrimination." 217 F.3d at 645. *See also*, *U.S. v. Piper*, 918 F.2d 839, 840 (9th Cir. 1990) (expressing concern that "conditioning a U.S.S.G. § 3E1.1 reduction on admissions of responsibility for conduct of which a defendant was not convicted could violate his Fifth Amendment rights").

A review of the sentencing proceeding, however, makes clear that the trial judge was not looking for Petitioner to admit he was not provoked sufficiently to reduce his intentional homicide to manslaughter. The trial judge repeatedly made clear that he was satisfied that the crime had been established to be a provoked manslaughter.

> But this case is a case of manslaughter. And that is defined and defined clearly in the heat of passion; and ths is that the person commits manslaughter by committing second degree murder upon sudden quarrel or heat of passion resulting from adequate provocation by the victim. And adequate provocation is defined as conduct or circumstances sufficient to deprive a reasonable person of self-control.
>     I reiterate that that is what the case is because that is what the plea was to and that is what the factual basis that was presented for this plea was and that is what we have. And in this plea - - and there is a substantial factual basis for that, as was put on the record by both counsel - - or by both sides and by both counsel representing the state and the defendant at the prior hearing. What might have been from - - is simply what might have been, but there was clearly, no matter how constricted the facts, the state and the defense put a substantial factual basis showing that there was - - that this was a manslaughter case.

(Exhibit M, R.T. 6/15/00 at 124-125.)  Moreover, the trial judge had openly rejected efforts by both sides to ignore the crime of conviction by "double-dipping" on the basis of provocation: the prosecution to aggravate the sentence, and the defense to mitigate it.  (*See* Exhibit U, Mem. Dec. at 13 ("We interpret this to mean that the judge agreed to not consider the degree of provocation as either a mitigating or aggravating factor.").)

Petitioner argues that no remorse was possible "because he was adequately provoked by the victim."  (Traverse, #57 at 23.)  However, it must remembered that provoked manslaughter is not a technical, amoral offense.  Though Petitioner's conduct was provoked, it was not innocent.  Petitioner intentionally took a life, the most reprehensible form of human conduct,  because he was unable to control his actions.

> In the end, the culpability of an actor guilty of manslaughter consists in his failure to exercise his capacity for self-control. Gripped with a desire to kill his provocateur, he could and should have controlled that desire. But he failed to do so.

Garvey, *Passion's Puzzle*, 90 Iowa L. Rev. 1677, 1730 (2005).  While  the state of Arizona may have chosen to reduce the degree of punishment where the provocation was sufficient that reasonable people would have been provoked, the state still demands better of its citizens, and thus still punishes the provoked homicide.  The trial court was looking for Petitioner to acknowledge that his conduct, although provoked, was wrong.

Further, there was substantial evidence that Petitioner was not a surprised, random victim of the provocation.  The evidence at the sentencing hearing revealed that Petitioner had courted disaster by:

1.   his persistent use of methamphetamine;

> A. [Detective Treadway] I posed a question to him, "when is the last time that you had used drugs?" and his response was , "Yesterday and the day before."

(Exhibit K, R.T. 6/13/00 at 98.)

> Q.   In the [defendant's] journal is there an indication of how long Mr. DeBerry had been using methamphetamine?
> A. [Detective Treadway]   Yea.  In the first entry, I think it was on the 11th of February 1998, he - - in quotation marks he puts that he's a frequent meth user and sometimes abuser, and he writes "nine years."
> Q.   And Mr. DeBerry was 26 at that time?

1          A.   Yes, sir.
           Q.   So he'd been using, according to that entry, since 17 - - 16
2    or 17?
           A.   Yes, sir.
3    (Exhibit K, R.T. 6/13/00 at 124.)

4    2.   Maintaining a relationship with the victim, and continuing to take advantage

5         of the victim's drug resources and willingness to provide Petitioner

6         transportation;[8]

7          Q.    Now, did [the defendant] describe the basis of his
     relationship with Lamont Lattery?  What did he tell you about that?
8          A. [Detective Treadway]   Yeah. He told - - he told me that he
     would be nice to Lamont because Lamont would give him, quote,
9    "party favors," unquote.
           Q.   And what did you take "party favors" to mean?
10         A.   I thought it meant drugs.
     * * *
11         Q.   Did he describe the things that he was getting out of the
     relationship with Lamont Lattery?
12         A.   It was centered around drugs.  He made several references
     to obtaining drugs from Lamont; "Lamont handed me the drugs," those
13   kinds of statements.
           Q.   Or the party favors were drugs?
14         A.   That's correct.
           Q.   Did he talk about getting transportation from Lamont?
15         A.   Yes, he did.
           A.   What did he say?  How did he say that worked?
16         Q.    He said that Lamont had a tow truck and that basically at
     the drop of a dime he could call Lamont and Lamont would be there.
17
     (Exhibit K, R.T. 6/13/00 at 99, 103.)
18
           Q.    All right, and do you find in [the transcript of Petitioner's
19   interview] a one-way relationship where Mr. Lattery is being taken to
     the cleaners by an insensitive, not nice guy, Mr. Deberry?
20         A. [Detective Treadway]    No.  It looks like there's two ways.

21   _____

22         [8]  That is not to suggest that one should be faulted for befriending someone who
     unilaterally desires a more intimate relationship.  Here, however, Petitioner mixed that
23   difficult situation with the volatility of mutual methamphetamine use, and a person he
     purportedly knew to be undeterred, violent, and armed.  In addition, he did so despite his
24   immense concern about the reputation of his own sexual orientation, which at least in the era
     of this crime was often considered a slanderous matter.  *See Albright v. Morton*, 321 F.Supp.
25   2d  130, 136 n. 7 (D. Mass 2004) (rejecting but detailing decisions finding allegations of
     homosexuality to be libel *per se*).  *See generally*  Dressler, *When "Heterosexual" Men Kill
26   "Homosexual" Men: Reflections on Provocation Law, Sexual Advances, and the
     "Reasonable Man" Standard*   85 J. Crim. L. & Criminology 726 (1995) (discussing the
27   evolution in courts' willingness to recognize a nonviolent homosexual advance as reasonable
28   provocation).

                                    - 29 -

He was trying to help the guy more times than not; he would talk to him, he was being nice to him.

(Exhibit K, R.T. 6/13/00 at 176-177.)

3.   despite knowing of the unwanted emotional entanglement which it facilitated;

Q.   Did he discuss during that interview the - - whether or not there was a homosexual relationship?
A. [Detective Treadway]   He told me that he knew that Lamont was homosexual and he told me that he knew that Lamont wanted to engage in relations with him, but he claimed that he was not a homosexual and that he had not had sexual relations with Lamont.
Q.   Did he tell you who first brought up the issue of homosexuality between the two?
A.   He said he did.
Q.   He, Kyle, did?
A.   Kyle did, right.  Kyle said Lamont was hanging around the house for x amount of time and that one day he, in essence, just confronted him and he kept saying, "Are you a little" and he'd stop the phrase, "Are you a little" and, then, finally he said, "You're not all straight, are you?"  And Lamont confirmed his homosexuality.
* * *
Q.   And did he express that he had not wanted a sexual relationship; that Lamont was principally the person who wanted it?
A.   That's what he was expressing, yes.
Q.   In the course of that did he say that Lamont would ask if he could stroke him and they would get naked together?
A.   Yes.
* * *
Q.   Well, there's a reference there that Lamont would ask - - Lamont would play with himself with his clothes on and he would say, "let me stroke you off and we'd just get naked."  Do you see those references?
A.   Yes.
Q.   Do you remember that from the interview?
A.   Yes, I do.

(Exhibit K, R.T. 6/13/00 at 113-116.)

Q.   It sounds to me like, "You want to suck me off.  And we'd just get naked or something."  Are you saying that's an admission by Mr. DeBerry that he got naked with this gentleman, this homosexual man that he couldn't stand?
A. {Detective Treadway]   I'm reading from the transcript here.
Q.   You don't see a different read of that statement?
A.   No.
Q.   Good.  And we'll get to that.  And then he says - - does this not give you some clarity on what he said? - - "I just got used to kind of, just, you know, whatever.  I'd laugh or whatever."  Does it sound like he engaged in that?
A.   No, it doesn't sound like he engaged in that.
* * *
THE WITNESS:   It says, "I don't know why somebody would keep insisting after you told him, no."

- 30 -

Q.   BY MR. GRIFFEN.  No.  He told him no?
A.   Yes.

(Exhibit K, R.T. 6/13/00 at 173-175.)

Given the sentencing proceeding as a whole, including Petitioner's statements and the trial judge's explanation of his sentencing decision, the undersigned is firmly convinced that Petitioner's silence was not relied upon to enhance his sentence.

The undersigned finds that the trial judge was not relying upon Petitioner's silence at all.  Rather, the trial judge simply evaluated the evidence before it, including Petitioner's own statements, to determine whether Petitioner was taking any responsibility for this homicide, and thus whether he was capable of being remorseful for his conduct, as opposed to simply the consequences of that conduct.

**Petitioner Waived Right to Remain Silent on Remorse Issue** - Even had the trial judge relied upon Petitioner's silence, it would have only been to ascertain his lack of remorse for the victim.  On this issue, Petitioner no longer had a right to remain silent, having waived it by speaking on the issue of his remorse.  Petitioner testified at the sentencing hearing:

> I'd like to move on to the issue of remorse. . . .
> I still have a lot of conflict and a lot of confusion when it comes to my feelings on what took place with myself and Lamont and how remorseful I really am about his death.  He caused me not just a few days or a few letters that you've seen of hardship, but years of continual letters.  And we've gone into this, too, and it sounds like a broken record and running over the same thing so I'm not going to go in that direction either.

(Exhibit M, R.T. 6/15/00 at 121-122.) "It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell,* 526 U.S. at 321.[9]  *See also State v. Kauk*, 691 N.W.2d 606, 610 (S.D. 2005) (defendant can't speak then assert right to

---

[9]  The *Mitchell* Court broached this issue to distinguish between the guilty plea proceeding and the sentencing proceeding in order to counter arguments that the waiver of the privilege inherent in the plea colloquy extended to the sentencing hearing.

remain silent was violated).[10]

In essence, Petitioner testified that he could not assert remorse for killing the victim because the killing was the victim's fault, the result of the victim's provocation.   Thus, this case is distinguishable from *Ketchings v. Jackson,* 365 F.3d 509, 512 (6th Cir. 2004), where the trial court found a lack of remorse despite the defendant's assertions of remorse, based upon his failure to make admissions.

In *Ketchings*, the defendant was convicted at trial for participation in a drive-by

---

[10]   The result would be unclear if it were concluded that Petitioner had been silent on his remorse, had  not waived his right to remain silent, and the trial judge relied on that silence to find a lack of remorse. The *Mitchell* decision limited it's holding on the extension of the right to remain silent into sentencing:

> Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1988), is a separate question.  It is not before us, and we express no view on it.

526 U.S. at 330.   *See  Lee v. Crouse*, 451 F.3d 598, 605 (10th Cir. 2006) ("it remains unanswered by the Supreme Court whether a sentencing court in a non-capital case may, for purposes other than determining the facts of the offense of conviction, draw an adverse inference from a criminal defendant's refusal to testify or cooperate").  The Ninth Circuit has summarized *Mitchell* as holding that "a sentencing court may not, *in determining facts relating to circumstances and details of a crime*, draw an adverse inference from a defendant's silence."  *U.S. v. Mezas de Jesus,* 217 F.3d 638, 644 (9th Cir. 2000).  This distinction, between determinations concerning the nature of the crime versus the nature of the defendant, was sharply criticized by Justice Scalia in his dissent in *Mitchell.  Mitchell,* 526 U.S.at 340 (Scalia, J. dissenting) ("we will have a system in which a state court can increase the sentence of a convicted drug possessor who refuses to say how many ounces he possessed-not because that suggests he possessed the larger amount (to make such an inference would be unconstitutional!) but because his refusal to cooperate suggests he is unrepentant").

Like the dissent in *Mitchell*, the undersigned sees little rational reason to differentiate between the use of silence to determine a fact on the nature of the crime and the use of silence to determine a fact on the nature of the defendant.

> *Mitchell* explicitly disclaimed addressing whether a sentencing judge or jury might properly give weight to a defendant's silence at sentencing insofar as it tended to show lack of remorse or failure to accept responsibility for the crime.  Lower courts have attempted to read *Mitchell* as permitting sentencing authorities to consider silence in these ways, ***but doing so is difficult if not impossible***.

McCormick on Evidence § 121 (2006).

shooting.  At sentencing, the defendant expressed sympathy for the death of the victim and the resulting harm to the family, but still did not admit participation in the shooting.  The trial court then enhanced his sentence for a "lack of remorse."  The Sixth Circuit found unreasonable the state court's factual determination that the trial court had not relied on the defendant's failure to admit guilt, and simply relied on other evidence of a lack of remorse. "The fact that the sentencing judge criticized Ketchings for his failure to admit guilt even after he [expressed his sympathy for the victim and family] clearly contradicts the Michigan Court of Appeals's finding that the sentencing judge concerned himself only with remorsefulness and not with the admission of guilt." 365 F.3d at 514. The Sixth Circuit, relying on *Mitchell*, affirmed the district court's judgment granting the writ on condition of re-sentencing.

**4. Conclusion re Right to Remain Silent** - The Arizona Court of Appeals' decision was contrary to clearly established Supreme Court law when it rejected Petitioner's Fifth Amendment claim on the basis that his guilty plea precluded any right to remain silent. Nonetheless, Petitioner is not entitled to relief on this claim because he has failed to establish that his sentence was based upon his silence, and because he waived his right to remain silent on the issue of remorse by voluntarily testifying about his remorse.  Accordingly, Petitioner's Ground 1(b) is without merit and must be denied.


## C.  AGGRAVATION BASED ON DRUGS

For his Ground 1(c), Petitioner argues that the sentencing court's consideration of Petitioner's drug use and addiction as an aggravating factor, rather than a mitigating factor, was a violation of state law and a denial of due process. (Second Amended Petition, #60 at 1.)  Respondents argue that Petitioner failed to present this claim as a federal claim and thus failed to exhaust his state remedies with respect to Claim 1(c), and it is now procedurally defaulted.  (Answer, #9 at 22-23.)   Respondents further argue that the claim is a state law claim  not cognizable on habeas review.  (*Id.* at 23-24.)

In his Petition for Post Conviction Relief, Petitioner argued that his rights under the

5th, 6th and 14th Amendments were violated when the sentencing court found two unauthorized aggravating factors. (Exhibit N, PCR Petition at 2.) Petitioner then proceeded to identify those two factors as Petitioner's lack of remorse (*id.* at 32-33) and Petitioner's impairment, including his drug use (*id.* at 34-36). While not a masterpiece of clarity in arguing that the drug usage and addiction was an improper aggravating factor, the Petition was sufficiently clear that the PCR judge based her vacating of the sentence in part on the lack of support for the aggravation based on drug use. (Exhibit P, M.E. 11/7/01 at 2.)

However, Petitioner did not renew his due process argument in his Response on appeal (Exhibit R) or his Cross-Petition for Review (Exhibit S). He did revive the argument, after the reversal by the Court of Appeals, in his Petition for Review to the Arizona Supreme Court. (Exhibit V at 9.) To that court he argued:

> The Court of Appeals erred by holding that the trial court properly considered Kyle DeBerry's history of methamphetamine use as an aggravating circumstance. DeBerry's drug use at the time of the offense and drug addiction are not aggravating under A.R.S. § 13-702(c)(19) and should have been considered a mitigating factor. The sentencing court and the Court of Appeals violated DeBerry's Due Process right to have the state follow its own requirements/law in depriving a citizen of his liberty. Fourteenth Amendment to the U.S. Constitution and Article II § 2 of the Arizona Constitution.

(Exhibit V at 9.) That claim not addressed by the Arizona Supreme Court, but was summarily denied. (Exhibit X, Order 5/20/03.) Having skipped the presentation of his due process claim to the Arizona Court of Appeals, Petitioner's presentation of that to the Arizona Supreme Court was not sufficient to exhaust his remedies. *Casey,* 386 F.3d at 918.

As with his claims on mitigation for drug usage and ADHD, Petitioner has now procedurally defaulted on these claims, and offers no showing of cause and prejudice or actual innocence to escape the effect of that procedural default.

Accordingly, this Ground 1(c) must be dismissed with prejudice.

## D. BREACH OF PLEA AGREEMENT - Ground 2

For his Ground 2 for relief, Petitioner argues that his due process rights were violated when the prosecution breached the pleas agreement by: (a) arguing at sentencing a lack of

provocation, after inducing Petitioner to plead guilty on the basis that the manslaughter was based on adequate provocation; and (b) referring to second degree murder as part of its sentencing argument, in violation of the plea agreement. (Second Amended Petition, #60 at 6.)

Respondents argue that this claim was not exhausted because it was not presented to the Arizona Supreme Court. (Answer, #9 at 27-31.)  On the merits, Respondents argue that the state court's findings of no agreement are supported by the record, and the state courts properly applied federal law.  (*Id.* at 34-43.)

**1. Exhaustion**

**Presentation to Arizona Court of Appeals Sufficient** - Respondents argue that to have exhausted his state remedies, Petitioner must have presented his claims to the Arizona Supreme Court.  (Answer, #54 at 27-31.)

*Exception for Discretionary Review Excluded by State* - In *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) the Supreme Court recognized that it is only "available" remedies that must be exhausted, and that requiring prisoners to pursue discretionary review by state courts may result in an unwelcome increase in filings with state courts. 526 U.S. at 847.  Thus, the Court instructed that habeas courts are not to ignore state rules or law making a given procedure "unavailable." *Id.*  In his concurrence in *O'Sullivan,* Justice Souter noted: "I understand that we leave open the possibility that a state prisoner is likewise free to skip a procedure even when a state court has occasionally employed it to provide relief, so long as the State has identified the procedure as outside the standard review process and has plainly said that it need not be sought for the purpose of exhaustion."  *Id.* at 1735 (Souter, J. concurring).

*Application of Exception in Arizona* -  In *O'Sullivan*, the Supreme Court specifically cited *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989).  In *Sandon*, the Arizona Supreme Court noted that there was no right to appeal to the Arizona Supreme Court except in cases where the death sentence or life imprisonment is imposed, citing Ariz. Rev. Stat. A.R.S. §

12-120.21(A)(1).[11] *Sandon*, 161 Ariz. at 158, 777 P.2d at 221.  Thus, the Arizona Supreme Court held that a petition for review to the Arizona Supreme Court was not required to exhaust state remedies for federal habeas purposes.

In *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999), the Ninth Circuit relied on *O'Sullivan* and *Sandon* to conclude that absent a death penalty or life sentence, Arizona state prisoners have exhausted claims presented in habeas petitions if they have been ruled upon by the Arizona Court of Appeals.  *Id.* at 1009-10.

*Effect of 2004 Decision in Baldwin* - Respondents argue that the holding in *Swoopes* is no longer valid following the Supreme Court's decision in *Baldwin v. Reese*, 541 U.S. 27 (2004).  (Answer, #9 at 27-31.)  However, since *Baldwin* the Ninth Circuit has reaffirmed the holding of *Swoopes*.  "In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 n. 3 (9th Cir. 2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir.1999)).  Not only was *Castillo* decided in 2005, after *Baldwin,* but the *Castillo* decision even cites to *Baldwin*.  *Id.* at 998.

Moreover, nothing in the *Baldwin* decision serves to undermine the rationale of *Swoopes*.  Respondents cite the portion of *Baldwin* which notes that the state habeas petitioner is required to present his claims "in each appropriate state court (including a state supreme court with powers of discretionary review)."  *Baldwin,* 541 U.S. at 29 (as cited in Answer, #9  at 27).  However, the question of "how" to present (e.g. is the state court required to search the record below for federal claims) was before the *Baldwin* Court, not the question of "where" to present. Moreover, that very portion of *Baldwin* cites *O'Sullivan* as one of its authorities.  *O'Sullivan* itself stands for the proposition that the mere fact that review by a court is "discretionary" does not make it unavailable for exhaustion purposes.

---

[11]  The state statutes relied upon in *Sandon* have since been amended to eliminate the reference to life sentences, thus suggesting that only death sentences must be presented to the Arizona Supreme Court.  *See* Ariz.Rev.Stat. §§ 12-120.21 or 13-4031.

*O'Sullivan* also, recognized, however, that not all discretionary procedures are "available."

> The exhaustion doctrine, in other words, turns on an inquiry into what procedures are "available" under state law. In sum, there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available. We hold today only that the creation of a discretionary review system does not, without more, make review in the Illinois Supreme Court unavailable.

*O'Sullivan,* 526 U.S. at 847-848.

Respondents argue that the language of Rule 31.19 (establishing the Arizona Supreme Court's jurisdiction over non-capital criminal appeals) shows that *Swoopes* was in error. (Answer, #9 at 28.) While Rule 31.19 does give the Arizona Supreme Court jurisdiction over such appeals, it is not for the federal courts to dismiss the clear holding of *Sandon* that despite such jurisdiction, the Arizona Supreme Court does not desire to be part of the normal review process for purposes of exhausting claims for federal habeas review.

Respondents reference the fact the Arizona Supreme Court has exercised discretionary review in a substantial number of cases since *Sandon*. (Answer, #9 at 28-29.) This is irrelevant. In *O'Sullivan*, Justice Souter noted that it was not controlling that the "state court has occasionally employed [a procedure for discretionary review] to provide relief." Indeed, *Swoopes* was not based upon some periodic rejection of jurisdiction by the Arizona Supreme Court, but upon the state court's expression that its jurisdiction was "outside the standard review process and has plainly said that it need not be sought for the purpose of exhaustion." *O'Sullivan*, 526 U.S .at 1735 (Souter, J. concurring).

Respondents argue that *Swoopes* somehow misread *Sandon* and other Arizona decisions. (Answer, #9 at 29.) Even if this Court were convinced that this were so, this Court cannot overrule the decision of the Ninth Circuit Court of Appeals in *Swoopes*. Perhaps most importantly, the Arizona courts have not retreated from *Sandon*. Until the Arizona Supreme Court revises its expression in *Sandon* that its review is not necessary for exhaustion, or the Supreme Court overrules *O'Sullivan*, this Court must conclude that *Swoopes* remains good law.

Respondents suggest that there remains such uncertainty about the import of *Sandon*

that this Court should certify a question to the Arizona Supreme Court to inquire about the availability of their review in this case.  (Answer #9 at 30.)  Certainly the Arizona Supreme Court is not ignorant of the holding in *Swoopes* and its interpretation of *Sandon*. Respondents do not suggest that the Arizona Supreme Court is incapable clarifying its holding in *Sandon* if that holding has been misunderstood.

Based upon the foregoing, the undersigned concludes that the rationale and holding of *Swoopes* remains in tact.  Because Petitioner received neither a life sentence nor the death penalty, the presentation of his claims to the Arizona Court of Appeals was sufficient to exhaust his state remedies.

**2.  Standard of Review**

The Arizona Court of Appeals addressed the merits of Petitioner's claim in Ground 2.  Consequently, this Court must address the claim under the deferential, "unreasonable application" or "contrary to" standard in 28 U.S.C. § 2254(d)(1), and the "unreasonable determination of the facts" standard in § 2254(d)(2), as well as applying the presumptions of correctness to the state court's factual findings as provided in 28 U.S.C. § 2254(e)(1).

**3.  State Court's Decision**

The Arizona Court of Appeals noted that the Arizona state courts follow federal law in relation to breaches of plea agreements.  The court quoted *Santobello v. New York*, 404 U.S. 257 (1971), as holding that "'when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'" (Traverse Exhibit K, Mem. Dec. at 10, quoting *Santobello*, 404 U.S. at 262.)  They went on to note that the Arizona cases applying that law have held "that a breach of a plea agreement occurs not only when the State directly breaks its promise, but also when the spirit of the inducement, reasonably inferred from the written agreement, is breached."  (*Id.* at 10.)

The State court then made the following factual findings:

1       1.     "The plea agreement did not contain a stipulation as to sentencing, but specifically states that the 'sentence [is] left to the discretion of the court.'" (Travers Exhibit K, Mem. Dec. at 11.)

2.     At sentencing, the state "presented evidence to demonstrate it's position 'that there [was] really barely a statutory minimum of issues of provocation.'" (*Id.*)

3.     "[T]he defendant presented substantial evidence to counter this position and show that the provocation was great." (*Id.* at 11-12.)

4.     "In this case, the evidence concerning the degree of provocation involved was part of the evidence of the circumstances surrounding the commission of the crime. This evidence was relevant to the issues of aggravation and mitigation." (*Id.* at 13.)

Based on these factual findings, the state court concluded that there was "no breach of the plea agreement by the State." (*Id.*)

**4.  Clarifying Petitioner's Argument**

Petitioner does not assert that the Arizona Court of Appeals improperly ascertained the federal law on the issue. Petitioner does not challenge the state court's finding that the plea agreement did not contain stipulations about sentencing, nor does he argue that the plea agreement precluded the arguments made by the prosecution on the degree of provocation. Indeed, Petitioner concedes that "the State was entitled to rebut Petitioner's evidence of 'extreme provocation'." (Traverse, #57 at 17.) Rather, Petitioner argues "the prosecutor was not entitled to cross the line, which it did by essentially arguing that the facts barely made out a manslaughter case and, essentially, that they were tantamount to second degree murder. " (*Id.*) He claims that the "State agreed in the plea agreement that Petitioner was provoked and at sentencing, however, improperly argued a lack of adequate provocation." (Second Amended Petition, #60 at 6.)

Petitioner has been consistent, if not always consistently clear, on the nature of his claim. To the PCR court he argued that "the Prosecutors 'agreed' that Petitioner's position

of adequate provocation was correct" but "breached the agreement . . .by representing to the sentencing court that adequate provocation did not exist at the time Lattery was shot." (Exhibit N, PCR Petition at 6, 2.)  In his Petition for Review to the Arizona Court of Appeals, Petitioner summarized his argument as follows: "Notwithstanding its protestations that it was merely correcting the record to indicate the actual and minimal level of provocation, the state's genuine motive was clear: to have the court sentence DeBerry as if he had committed an intentional unprovoked murder making its original agreement nothing more than a hollow promise."  (Exhibit S, Cross-Petition for Review at 14.)

On the other hand, throughout the proceedings, the State has persistently focused on the existence of an agreement on the permissible arguments at sentencing, and argued that Petitioner was simply trying to  "bootstrap the state's acceptance of the factual basis into a promise by the state not to comment on the extent of the provocation."  (Exhibit O, Resp. to PCR Pet. at 11.)  (*See also*  Exhibit T, Resp. to Cross-Pet. at 3 ("The Cross-Petition argues that the State breached the plea because an agreement by the State not to discuss the extent of provocation had somehow been created during the recitation of the factual basis at the time of the plea.").)

The Arizona Court of Appeals followed the state's lead in focusing on the statement of factual basis for the plea, and summarized Petitioner's argument as a claim that "by entering into the plea agreement, the State promised to accept the factual basis for the plea." (Traverse Exhibit K, Mem. Dec. at 9.)  No mention was made by the state court of the effect of the stipulation to the charge or of Petitioner's assertion that an explicit, albeit oral, parol agreement had been made by the prosecution to the existence of the legal provocation.  Nor did the Arizona Court of Appeals address the distinction between arguing the details of a crime, and arguing that some greater but not contradictory crime had been committed, versus arguing that a mutually exclusive crime (unprovoked murder v. provoked manslaughter) had been committed.

//

//

**5.  Nature of the Agreement**

In his Amended Petition to this Court, Petitioner argues that his plea was induced by the prosecution "representing in plea negotiations , that the voluntary manslaughter plea was based on adequate provocation."  (#60 at 6.)  In *Santobello,* the Supreme Court held that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello,* 404 U.S. at 262. *See e.g. U.S. v. Anderson,* 970 F.2d 602, 607 (9th Cir. 1992) (stipulation as to the maximum quantity of drugs distributed, if breached by disclosure of excess quantity in presentence report, would be violation of *Santobello*).

"*Santobello* requires that the plea agreement be construed according to state contract law, and requires that the terms of a valid plea agreement be enforced. *Brown v. Poole,* 337 F.3d 1155, 1160 n. 2  (9th Cir. 2003).    In determining what terms are part of a plea agreement,

> "[W]e employ objective standards--it is the parties' or defendant's reasonable beliefs that control.... The construction we adopt, however, incorporates the general rule that ambiguities are construed in favor of the defendant. Focusing on the defendant's reasonable understanding also reflects the proper constitutional focus on what induced the defendant to plead guilty."

*Brown v. Poole,* 337 F.3d 1155, 1159 -1160 (9th Cir. 2003) (quoting  *United States v. De la Fuente,* 8 F.3d 1333, 1337 n. 7 (9th Cir.1993)).  "What the parties agreed to in any given case is preeminently a question of fact."  *U.S. v. Helmandollar,* 852 F.2d 498, 501 (9th Cir. 1988). As such, the findings of the state court are subject to the presumptions of correctness and limitations on relief in § 2254.

Petitioner points to three sources for an agreement that adequate provocation existed: (a) the written agreement to the charge to which Petitioner would plead; (b) and an implicit stipulation to the statement of factual basis offered at the plea hearing; and (c) an explicit parol agreement that provocation did in fact exist.

//

//

1        **a.  State Court's Findings**

2        The Arizona Court of Appeals made no explicit determination of the nature of the

3   parties' agreement, beyond finding that there was no "stipulation as to sentencing."

4   (Traverse Exhibit K, Mem. Dec. at 11.)  That court did not resolve whether there were any

5   stipulations or agreements as to the nature of Petitioner's conduct.  Respondents argue that

6   this Court is required to apply a presumption of correctness to not only that explicit factual

7   findings of the state courts, but their implicit findings as well.[12]  (Supplemental Answer, #54

8   at 9.) Because it does not affect the outcome, the undersigned presumes: (1)  that implicit

9   findings are entitled to a presumption of correctness and (2) that the state court made an

10  implicit finding that there was no agreement as to the specific factual basis of the crime or

11  the degree of provocation, but rather only an agreement as to the manslaughter charge to

12  which Petitioner would plead and thus to the existence of the provocation necessary to

13  support that charge.

14       Even without that presumption, the undersigned would find no basis for extending the

15  agreement of the parties beyond the existence of provocation.

16  / /

17  / /

18  ─────────────────────

19       [12]  To establish their contention on implicit findings, Respondents cite decisions from
20  the Fifth, Third, and Eleventh circuits, as well as the Ninth Circuit's decision in *Taylor v.
    Stainer*, 31 F.3d 907, 909 (9th Cir. 1994).  However, *Taylor* was not concerned with the
21  presumption of correctness to be accorded state court findings of fact on habeas review, but
    the deference afforded the original trier of fact "[w]hen determining the sufficiency of the
22  evidence" to sustain a finding of guilt. 31 F.3d at 908-909.  As recently as April 2006, the
23  Ninth Circuit has acknowledged that the issue of deference to implicit findings is unresolved.
              We are not convinced that we are bound by a state court's implicit findings
24            under AEDPA. Indeed, deference to state court implicit factfinding would
              likely vitiate the function of federal courts on habeas, because the state could
25            always point to some "implicit" finding by the state court to fill in a whole
              variety of constitutional defects.
26  *Goldyn v. Hayes,* 444 F.3d 1062, 1065 n. 5 (9th Cir. 2006). Even Respondents acknowledge
27  that the presumption of correctness for implicit findings is limited to "findings which are
    necessary to the state court's conclusions of law. (Supplemental Answer, #54 at 9.)

28

1

**b.  Petitioner's Arguments**

2     Petitioner points to three sources for an agreement that adequate provocation existed:

3  (1) the written agreement to the charge to which Petitioner would plead; (2) and an implicit

4  stipulation to the statement of factual basis offered at the plea hearing; and (3) an explicit

5  parol agreement that provocation did in fact exist.

6     (1)  Agreement from Stipulated Charge  - Petitioner asserts that the existence of an

7  agreement to the existence of at least the legal minimum level of provocation is implicit in

8  the written plea agreement's provision allowing Petitioner to plead guilty to manslaughter.

9  Respondents do not challenge this issue, arguing instead that the implicit agreement did not

10  extend so far as to preclude arguments about the degree of provocation above the legal

11  minimum.

12     Indeed, in responding to Petitioner's Cross-Petition for Review on this issue, the state

13  argued that:

14              Thus, the State, by agreeing to lower the charges to Manslaughter under
             this section of the Criminal Code, conceded "adequate" provocation by
15              the victim.  Not "great" provocation, not "intense" provocation, but
             rather, as set forth by A.R.S. § 13-1101(4), "conduct or circumstances
16              sufficient to deprive a reasonable person of control."

17  (Exhibit T, Response at 2.)

18     Moreover, the finding of such an agreement was implicit in the Arizona Court of

19  Appeals' decision.  If that court had truly found no agreement on what could be argued by

20  the prosecution at sentencing on the issue of provocation, then there would have been no

21  reason for all of that court's efforts to cast the prosecution's evidence and argument as being

22  directed at the degree of provocation.  It would have made no difference whether the

23  prosecution had argued great provocation, minimal provocation, or no provocation.

24     (2)  Agreement from Statement of Factual Basis - Petitioner has also argued that  the

25  statement of factual basis offered at the change of plea amounted to a stipulation of given

26  facts.  Petitioner points to no authority indicating that a statement of factual basis amounts

27  to an agreement to abide by the statement throughout the proceeding.

28     Arizona has recognized that at least with regard to defendants, statements of factual

basis at a change of plea hearing do not amount to admissions  beyond the elements of the offense.  *See State v. Brown,* 210 Ariz. 534, 115 P.3d 128, 138 (Ariz.App. 2005) (applying *Blakely* and determining that factual basis was not an admission for sentencing purposes). *Cf. U.S. v. Cazares*, 121 F.3d 1241, 1248 (9th Cir. 1997) ("the better reasoning limits the effect of a guilty plea to an admission of the facts essential to the validity of the conviction"). While the preclusive effect of a statement of factual basis is most often considered with regard to contrary positions taken by the defendant (particularly in light of the constitutional protections at play in entering a guilty plea), there appears no reason to differentiate the effect on the prosecution.[13]

Thus, the undersigned finds no basis to conclude that there was an agreement by the prosecution to be bound at sentencing by the statement of factual basis offered at the plea hearing.

(3) Parol Agreement **-** Petitioner also argues that there was a parol agreement, entered into as part of plea negotiations, that provocation existed. In support of his contention, Petitioner presented affidavits from both defense counsel and Petitioner, avowing that there had been a representation by the prosecution that they agreed to not only the reduction of the charge, but also an agreement to the actual existence of provocation.

> On or about May 12, 2000, the prosecutor's [sic] told me they did and would agree that Lamont Lattery's course of conduct provoked Petitioner into shooting him.

(Exhibit N, PCR Petition, Attached Affid. Brian Griffen at ¶ 4.)  Those affidavits have never been countered by any affidavits from the prosecutors.  In the state proceedings, there was

---

[13]  It is true that, when applying the doctrine of "judicial estoppel," courts have been more amenable to treating a statement of factual basis as a binding stipulation.  *See Lowery v. Stovall,* 92 F.3d 219, 223 (4th Cir. 1996) (judicial estoppel precluded defendant from denying in civil rights suit the admissions in statement of factual basis in prior criminal prosecution). *See also Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get its Story Straight*, 89 Cal. L. Rev. 1423 (2001); and Winbush, *Judicial Estoppel in Criminal Prosecutions*, 121 A.L.R.5th 551 (2004).  Here, however, the question is not whether the prosecution should have been judicially estopped from arguing contrary to the statement of factual basis, an evidentiary question, but whether they agreed to abide by the statement, a contracts question.

1    never an assertion that those representations were not made.

2          Having apparently misapprehended the nature of Petitioner's claim as focusing on the

3    degree of provocation, the Arizona Court of Appeals had no cause to decide whether there

4    was an agreement on the existence of minimal provocation. Accordingly, no inference of a

5    finding on that issue can be made from the state court's decision. "It is well-established that

6    when the state courts do not make findings at all, no presumption of correctness attaches, and

7    we must make our own findings." *Taylor v. Maddox*, 366 F.3d 992, 1014 (9th Cir. 2004).

8    Accordingly, this habeas court must now determine *de novo* whether there was such an

9    agreement.

10          Although still miscasting it as a purported agreement on the degree of provocation,

11   Respondents now argue that no such parol agreement should be honored. In support of that

12   proposition, Respondents point to: (1) the absence of any provision in the written plea

13   agreement; (2) the absence of any mention of the agreement during the plea proceeding;[14] (3)

14   the questionable ethics of an agreement to hide "true" facts from the court;[15] (4) the right of

15   the sentencing court to consider the true nature of the defendant's conduct;[16] (5) the fact that

16   "the State conceded that adequate provocation existed to support the manslaughter charge";[17]

17   and (6) the representation of Petitioner and Counsel that the plea agreement represented the

18   ───────────────────

19          [14] Although, there was no explicit mention of the stipulation at the plea hearing, there
     were no statements to the contrary and the statement of factual basis offered by the
20   prosecutor was clearly in accord with the agreement that provocation existed. Moreover, this
     is not a situation where long after the proceedings have concluded a defendant suddenly
21   develops a recollection of some breached promise. *See e.g. Chizen v. Hunter*, 809 F.2d 560,
     562 (9th Cir. 1986) (relief granted where "as soon as Chizen learned that the sentence
22   imposed by the trial judge was different than the one he thought he had bargained for, he
     moved to withdraw his plea"). Nor is it a situation where the defendant's assertion of a parol
23   agreement is devoid of any corroboration, and is stringently denied by the other side.

24          [15] The existence of the prosecutor's ethical limitations is one reason why, in light of
     the agreed upon charge and the factual basis offered, it is not surprising that Petitioner and
25   his counsel voiced no concerns at the plea hearing.

26          [16] The issue is not what the court could consider, but what the prosecution could
     argue.

27          [17] The fact that "the State conceded that adequate provocation existed to support the
     manslaughter charge" (Answer, #8 at 41), bolsters Petitioners argument that such facts had
28   been stipulated to by the prosecution.

entire agreement.  (Answer #9 at 35-43.)  Only the first and last contentions merit scrutiny.

*No Written Promise* - It is true that the plea agreement contains no express stipulation as to the actual existence of provocation.  However, that is not fatal to Petitioner's claim.  "In Arizona, extrinsic evidence, including negotiations, prior understandings, and subsequent conduct may be considered to determine the parties' intent with regard to the integration of a contract and its purpose."  *Anderson v. Preferred Stock Food Markets, Inc.,* 175 Ariz. 208, 211, 854 P.2d 1194, 1197 (Ariz. App. 1993).  "'Where the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition.'" *Id.* at 212, 854 P.2d at 1198 (quoting Restatement of Contracts § 217 at 141).  "Parol evidence is generally inadmissible if it directly contradicts an express term of a written contract or is directly contrary to the entire purpose of the written contract."  *Id.* at 212-213, 854 P.2d at 1198-1199.

> On the other hand, when parol evidence does not directly contradict the express terms of the writing but is generally consistent with the writing, it may be admitted. 3 Corbin § 583 at 475 (written contract does not prevent the proof of additional, consistent oral collateral terms that a reasonable and prudent person may be expected not to put in writing); Restatement § 216 at 137 (consistent additional agreed term which might naturally be omitted from the writing is admissible)

*Id.* at 213, 854 P.2d at 1199.

Here, the plea agreement contains no integration clause or other representation that it is the sole embodiment of the parties' agreements.  (*See* Exhibit F, Plea Agreement.)  Moreover, the plea agreement is not inconsistent with such a stipulation, inasmuch as it provides for the reduction of the charge to manslaughter, which requires the existence of legally sufficient provocation.

Further, Arizona has recognized in the particular context of plea agreements that "as in *Santobello*, an oral promise is just as binding as if written directly into the plea agreement."  *State v. Romero,* 145 Ariz. 485, 487, 702 P.2d 714, 716 (Ariz.App. 1985).

*Representations at Plea Proceeding* - The only factor cited by Respondents which would serve to refute Petitioner's contention of a parol agreement would be a representation

1    of Petitioner and Counsel that the plea agreement represented the entire agreement. "[T]he

2    representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as

3    any findings made by the judge accepting the plea, constitute a formidable barrier in any

4    subsequent collateral proceedings." *Blackledge v. Allison,* 431 U.S. 63, 74 (1977).

5    However, " the barrier of the plea or sentencing proceeding record, although imposing, is not

6    invariably insurmountable." *Id.* at 74-75. "[T]he federal courts cannot fairly adopt a per se

7    rule excluding all possibility that a defendant's representations at the time his guilty plea was

8    accepted were so much the product of such factors as misunderstanding, duress, or

9    misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for

10   imprisonment." *Id.* at 75.

11       Respondents argue that both Petitioner and his counsel had "stated in open court that

12   the plea agreement reflected their entire agreement with the State, and that the prosecution

13   had not made any promises not memorialized in the plea agreement." (Answer, #9 at 42.)

14   However, the plea proceeding transcript reflects no such representation.

15       Petitioner represented that: (1) he had read the plea agreement (Exhibit H, R.T.

16   5/12/00 at 4, 7-8); (2) he agreed to plead guilty to manslaughter (*id.* at 5); (3) he had agreed

17   that he would go to prison for a time to be determined by the court (*id.* at 6); (4) he had

18   signed and initialed the agreement (*id.* at 7, 8); (5) he had understood the agreement (*id.* at

19   7, 8); (6) counsel had explained the plea agreement (*id.* at 7); (6) there was nothing in the

20   plea agreement "that's incomplete or incorrect" (*id.* at 7); and (7) no one for the state had

21   promised him "something we haven't talked about" (*id.* at 9).

22       In hindsight, it is tempting to understand Petitioner's representations that the plea

23   agreement wasn't "incomplete or incorrect" and that there no promises "we haven't talked

24   about" as exclusive of the existence of a stipulation on provocation.  However, from a

25   layman's perspective, the distinction between a stipulation to a reduced charge and an

26   agreement that the plea reflected reality would not have been intuitive.  Indeed, it is so

27   counter-intuitive, that the Ninth Circuit struggled with whether such a bait and switch would

28   amount to a denial of due process. *See U.S. v. Castro-Cervantes*,927 F.2d 1079, 1082 (9th

1  Cir. 1990) ("But for the court to let the defendant plead to certain charges and then be

2  penalized on charges that have, by agreement, been dismissed is not only unfair; it violates

3  the spirit if not the letter of the bargain.") (superseded by U.S.S.G. amendments, as

4  recognized by *U.S. v. Barragan-Espinoza,* 350 F.3d 978, 983 (9th Cir. 2003)).

5      Counsel never made any representations as to the completeness of the plea agreement.

6  At the conclusion of the change of plea, after the presentation of the factual basis, the

7  following was asked:

8          THE COURT: Either counsel, any additions or corrections?
           MR. GRIFFEN [Defense Counsel]: No, sir.
9          MR. LARSEN [Prosecutor]: No, your honor.

10  (*Id.* at 14.)  Assuming this broad question was sufficient to incorporate a representation of

11  no parol agreements, by the time that counsel stated there were no "additions or corrections,"

12  the state had made it's offer of a factual basis relating the existence of legal provocation, just

13  as the parties had agreed.  (*See* Exhibit H, R.T. 5/12/00 at 10-13.)  Accordingly, the

14  undersigned finds that the representations of Petitioner and his counsel at the change of plea

15  do not foreclose the existence of the parol agreement.

16      There being undisputed evidence of a parol agreement, and nothing in the record to

17  preclude its existence, the undersigned finds clear and convincing evidence that the

18  prosecution represented to Petitioner and his trial counsel that the prosecution was conceding

19  the existence of provocation.

20      That conclusion is to be differentiated from a finding that there was any agreement

21  that the prosecution would not challenge the degree of provocation above the legal minimum.

22  Rather, only that the legal minimum provocation existed.  As related by trial counsel in his

23  affidavit, it is apparent that the agreement extended no further than the basic existence of

24  legally sufficient provocation.

25          On or about May 12, 2000, the prosecutor's [sic] told me they
           did and would agree that Lamont Lattery's course of conduct provoked
26          Petitioner into shooting him. . . . I made it clear that our agreement was
           that it was Lattery's course of conduct that provoked Petitioner into
27          shooting him.

28  (Exhibit N, PCR Petition, Attached Affid. Brian Griffen at ¶ 4-5.)

1  So limited, the existence of that agreement does not add anything to the prosecution's

2  burden beyond that arising from the written plea agreement.

3

4  **d.  Summary re Nature of Agreement**

5  After crediting the implicit findings of the state court  where they may be found, and

6  making an independent determination where they may not, the undersigned finds that the

7  prosecution agreed as a condition of Petitioner's plea that the facts of this case established

8  the legally minimum provocation necessary to a manslaughter charge.

9

10  **6.  Breach of the Plea Agreement**

11  Having determined what the nature of the prosecution's agreement and representations

12  were, the remaining question is whether that agreement was breached.

13  **a.  Inapplicable Authorities**

14  In Petitioner's case, the fundamental question is whether a prosecutor who stipulates

15  to the plea of a defendant to a particular charge may then argue the commission of a mutually

16  exclusive offense.  A series of authorities relied upon by Respondents and/or the Arizona

17  Court of Appeals cannot answer that question, and must be distinguished.

18  <u>Cases on Court's Authority</u> - First, cases dealing with the trial court's authority to

19  consider the true nature of the defendant's conduct are not determinative.  Here, the question

20  is not what could the court consider, but rather what could the prosecution argue.  Petitioner

21  does not argue that the trial court could not have rejected the stipulation to the existence of

22  provocation, and sentenced him accordingly (at least within the permissible range for

23  manslaughter).  Thus, cases such as *Augustine v. Brewer*, 821 F.2d 365 (7th Cir. 1987) (no

24  agreement to limit parole commission's consideration of omitted conduct) are inapposite.

25  <u>Cases on Presentation of Additional Conduct</u> - Second, cases dealing with sentencing

26  arguments based on additional, as opposed to contradictory, conduct are not determinative.

27  For example, Respondents point to *U.S. v. Fox*, 889 F.2d 357 (1st Cir. 1989).  In *Fox*, the

28  defendant pled guilty to charges on one falsified loan, in exchange for an agreement to not

prosecute on four other loans, but with no other agreements on sentencing.  The presentence report included information on the other four loans.   The court rejected defendant's *Santobello* claim.  There, however, the commission of the crime pled to did not exclude the possibility of the other four crimes.  The defendant could have committed the one offense pled to, and have committed the four omitted ones.

Similarly, in *U.S. v. Scroggins*, 965 F.2d 480 (7ᵗʰ Cir. 1992), the defendant pled guilty to possession of an unregistered firearm, in exchange for dismissal of charges that the possession occurred while he was a convicted felon.  Nonetheless, the prosecution argued the prior convictions as a basis for an upward departure. The court found no breach of the plea agreement.  Again, however, the simple possession was simply a lesser subset of the felon-in-possession charges, and was not mutually exclusive.  The defendant could both possess an unregistered firearm, and be a felon-in-possession.

Here, however, Petitioner could not be guilty of both manslaughter and second degree murder.  If there was provocation, it was manslaughter.  If there wasn't, it was murder.  The mutually exclusive nature of those charges operated to preclude the prosecution from arguing the lack of provocation. *See U.S. v. Taylor,* 77 F.3d 368, 369 (11ᵗʰ Cir. 1996) (plea agreement to possession of *marijuana* breached by government's argument at sentencing , in response to defendant's objections to presentence report, that evidence showed possession of *cocaine*).

Cases on Energy in Prosecution's Argument - Third, this Court must distinguish those cases where the prosecution agreed to recommend a particular sentence, but did so with less enthusiasm than the defense desired.  *See e.g. U.S. v. Benchimol*, 471 U.S. 453 (1985).  No implicit agreement to a degree of advocacy need be found here.  The question here is not one of degree but direction: a shift from conceding adequate provocation to arguing no provocation.

**b.  Evidence of Breach**

As noted above, the state court's conclusion of no breach was based upon the finding that the prosecution had simply argued that the level of provocation was minimal.  Indeed,

1   the record reveals that the prosecution purported to walk the line between arguing that the

2   provocation was present but limited, and arguing that it simply did not exist.  But the record

3   also clearly reflects that the prosecutor repeatedly crossed that line. While purporting to

4   concede the existence of legal provocation, the prosecutor was all the while denying that it

5   factually existed.

6         <u>Evidence at Sentencing</u>  -  In denying Petitioner's appeal, the Arizona Court of

7   Appeals cited testimony by Sergeant Treadway wherein he opined that the case should be

8   prosecuted as a first or second degree murder, and that there was no basis for a finding of

9   provocation.  However, this testimony came out on cross examination by defense counsel,

10   and was in response to leading questions by defense counsel.

11            Q.   [Defense Counsel] I asked Detective Gillette whether there
12   was any evidence to support a manslaughter situation in this case and she told me no.  Is that your position?
              A.   [Sergeant Treadway] My position was, from the onset of
13   this investigation, that I felt that first or second degree homicide charges were appropriate.

14   (Exhibit K, R.T. 6/13/00 at 139).

15         What is relevant here is the testimony elicited by the prosecution.

16         At the sentencing hearing, the prosecution obtained the following testimony from the

17   case agent:

18            Q.   [Prosecutor] Now during [the time you were arranging a
19   formal interview with the defendant] did [his father] Danny DeBerry offer any information that he had about Lamont Lattery except that he
20   knew him and he had talked to him about a month before and he had heard two messages on the machine?
21         A. [Sergeant Treadway]  No.  That's all he offered.
            Q. And did [his mother] offer anything?
22         A. No, sir.
            Q.   Specifically, did they report to you that Mr. Lattery had
23   been a pest or had been stalking Kyle or anything like that?
            A.   No.  Nothing like that was said.

24   (Exhibit K, R.T. 6/13/00 at 93-94.)

25            Q.   [Prosecutor]  And. . . are there any mentions in [DeBerry's
26   journal] of . . . Lamont Lattery stalking Mr. DeBerry?
            A.   [Sergeant Treadway] No, sir, there's not.
27         Q. Or threatening him?
            A. No.
28          Q. Or concerns about guns that he might have?

1          A.  No.

2  (Exhibit K, R.T. 6/13/00 at 121.)

3          Q.  BY MR. HORLINGS [Prosecutor]:  Now, in the DeBerry
   journal is there any indication that Mr. DeBerry feels harassed by
4  Lamont Lattery?
          A.  [Sergeant Treadway]  No.
5          Q.  Or that he's coming to his house?
          A.  No.
6          Q.  Or making unwanted phone calls?
          A.  No, sir.
7
   (Exhibit K, R.T. 6/13/00 at 129.)
8
9          Standing alone, that line of questioning could be understood as simply plumbing the

10 degree of the provocation.  However, coupled with the prosecutor's arguments, it was plain

11 that the prosecutor was intending to eviscerate the existence of any provocation.

12         Sentencing Memorandum - In its sentencing memorandum, the prosecution argued

13 that the provoking event was the phone message left by the victim on Petitioner's answering

14 machine, accusing Petitioner of "using drugs and being gay."  (Exhibit I, State's Aggravation

15 Hearing Memo. at 13.)  This was in accord with the factual basis presented at the plea

16 hearing, where the prosecutor represented:

17         DeBerry had apparently also received a phone call message from
   the victim on the same day of the shooting which apparently used
18 profanity and demeaning language towards DeBerry, and that
   apparently provoked DeBerry and led him to load his .45 caliber black
19 powder pistol gun and request a meeting with Lamont Lattery.

20 (Exhibit H, R.T. 5/12/00 at 10-11.)

21         However, the sentencing memorandum went on to attack both the factual foundation

22 and the legal sufficiency of the provocation.

23         Defendant has repeatedly claimed he shot [Lattery] because [Lattery]
   left an offensive message on his answering machine.   Only the
24 defendant ever hear that message, of course, although the police
   attempted to find it.  According to the defendant, the message accuse
25 him of using drugs and being gay.   Defendant claimed to [the
   polygrapher] that he was afraid his parents would hear it and killed
26 Lattery to prevent that.  However defendant's mother testified that she
   and defendant's father were already aware of defendant's drug problem
27 and were also aware that Mr. Lattery was telling people defendant was
   gay.  *Even if a call left on a message revealed secrets it could not
28 justify shooting the caller.*  This message, even on defendant's theory,
   did not reveal secrets.

- 52 -

(*Id.* at 13-14 (emphasis added, citations omitted).)

<u>Argument at Sentencing</u> - Not only in the prosecution's sentencing memorandum, but also at Petitioner's sentencing hearing, the prosecutor sought to not simply limit, but to eviscerate the agreed upon provocation. The prosecutor again argued that the phone message was inadequate provocation, and that the time for reflection eliminated any provocation.

> And I hope the Court will focus also in considering second degree murder, loss of control on sudden quarrel or impulse. And the unusual fact here that what's being bootstrapped into a justification is a - - not a conversation face to face, it's not a conversation over the phone, it's a message left on an answering machine. And so the question is, how long did Mr. DeBerry have to regain control?
> * * *
> ...the point is, he had more than three hours to cool off and to relax from whatever provocation was on that message.

(Exhibit M, R.T. 6/15/00 at 82-83.)[18]   And then, in the course of arguing that the sentence should be aggravated because it was a hate crime based on the victim's sexual orientation, the prosecutor again attacked the provocation from the phone message.

> And then the motive for the killing becomes not a phone call, which, again, you'll remember from the release hearing Mrs. DeBerry testified that they already knew that Lamont was telling people that he and Kyle had a sexual relationship. It's not to preserve them from that which is supposed to be on the tape, on the message machine, because they already knew that. It's to keep Lamont from telling the truth about what was going on when they were hanging out doing drugs and each of them using the other.

(Exhibit M, R.T. 6/15/00 at 95-96.)

This is clear and convincing evidence that the prosecutor went beyond arguing that the provocation was "barely a statutory minimum" and actually argued that the minimal legal provocation, and the facts on which it has been based, did not exist.

It is true that the distinction is not as sharp as in such cases where the stipulated quantity of drugs, or number of fraudulent letters is increased at sentencing. Rather, it is the

---

[18]   Petitioner argues that the agreement was further breached by this reference to "second degree murder." (Amended Petition, #60 at 6.) However, a review of the transcript reflects that this was simply a recitation of the applicable law, i.e. as explained by the trial judge later at sentencing, a "person commits manslaughter by committing second degree murder upon sudden quarrel or heat of passion resulting from adequate provocation by the victim." (Exhibit M, R.T. at 124.)

1    finer distinction, as Petitioner puts it, of "crossing the line."

2        **Effect of Acknowledgment of Stipulation** - It is also true that in both his sentencing

3    memorandum and his argument at closing that the prosecutor made repeated references to

4    the stipulation on the existence of provocation.  The carefully tailored argument by the

5    prosecution at sentencing was that there was "provocation that barely meets the statutory

6    test" (Exhibit I, Sentencing Memo at 13), and that there was "really barely a statutory

7    minimum of issues of provocation" (Exhibit M, R.T. 6/15/00 at 81).  Those references to the

8    agreement did not cure the breach.

9        A similar situation was confronted by the Eleventh Circuit in *U.S. v. Boatner,* 966

10   F.2d 1575 (11th Cir. 1992), where the government "agreed to stipulate . . .that two ounces of

11   cocaine would be the only quantity considered for sentencing purposes."  *Id.* at 1577.  The

12   presentence report reflected to the contrary that the defendants activities involved

13   "approximately three kilograms of cocaine."   In response to questioning by the court about

14   the disparity, the prosecutor responded:

15           [A]t the time the agreement was entered into with Mr. Boatner
             the two ounces, which represented a substantive count, was the only
16           substantive count the government felt it could prove against Mr.
             Boatner at that time. That was the reason for the stipulation.
17           Then subsequently, other cooperating witnesses provided
             information about Mr. Boatner, and those were the independent sources
18           for the additional two and three-quarters to three kilos which are in the
             report.
19           The government believes that information was provided
             independently by these outside sources. And the government believes
20           that the probation officer, that he has done his duty in putting those into
             the report.
21           The government will stick to its stipulation because, again, that
             was the reason it was entered. At the time that was what we could prove
22           against Mr. Boatner, and he was going to be-and proved to be a
             valuable, affirmative evidence gatherer for the government.

23   *Id.*   Relying on *Santobello*, the Court of Appeals found a breach of the plea agreement

24   notwithstanding the prosecution's purported adherence to its stipulation.

25           It attempts to hide behind its statement to the district court that " the
             government will stick to its stipulation...."  However, the government
26           supported the information contained in the presentence investigation
             report by declaring to the court that its later investigations had revealed
27           that the amount of cocaine involved was actually between two and
             three-quarters and three kilograms. This information was specifically

28

1  precluded by the plea agreement. Consequently, the government
2  violated its agreement at the sentencing hearing when it attempted to
   bolster the presentence investigation report.

3  *Id.* at 1579.

4      *Boatner* and Petitioner's case are easily distinguished from those cases where a

5  prosecutor is faced with the quandary of either lying to the court or honoring the plea

6  agreement.  For example, in *U.S. v. Allen*, 433 F.3d 1166 (9th Cir. 2006), the defendant pled

7  guilty to a charge of possession of counterfeit moneys in exchange for an agreement that the

8  government would recommend a specific offense level at sentencing.  Upon receiving a

9  presentence report that recommended an increase offense level based on a determination that

10 the defendant had actually done the counterfeiting, the court *sua sponte* ordered an

11 evidentiary hearing.  At the hearing, the court specifically asked the prosecutor "whether

12 materials used for counterfeiting had been found at Allen's residence."  *Id.* at 1169.  The

13 prosecutor acknowledged that they had been found.  The court then asked to have the Secret

14 Service Agent testify.

15     The district court then asked the prosecutor to call the secret service
       agent to the stand to testify as to what had been found at Allen's house.
16     Before doing so, the prosecutor clarified that the government stood by
       the recommendation to which it had stipulated in the plea agreement
17     and that it was the district court that requested the testimony, stating:
       "To clarify, the United States is standing by its plea agreement and
18     standing by its calculations. To clarify, your honor, the court would like
       information from the case agent regarding whether Mr. Allen had
19     custody and control over a counterfeiting device or materials used for
       counterfeiting?"  Defense counsel objected, stating that she
20     "anticipate[d] making an argument on breach."

21 *Id.*  In rejecting the defendant's appeal of his sentence, the Ninth Circuit acknowledged the

22 prosecutor's ethical dilemma.

23     Allen does not argue, as he cannot, that the government should not have
       answered the district court's questions.  "[A] plea agreement does not
24     bar the government from honestly answering the district court's
       questions. To the contrary, honest response of the government to direct
25     judicial inquiry is a prosecutor's professional obligation that cannot be
       barred, eroded or impaired by a plea agreement." On the other hand, an
26     "attempt by the government to influence the district court" to impose
       a harsher sentence than the one to which the government agreed in the
27     plea agreement to recommend would violate the agreement.

28 *Id.* at 1175.  The court specifically distinguished *Boatner* on the basis that the prosecutor in

*Boatner* simply "contradicted the facts in the plea agreement . . . in response to the defendant's claim" at sentencing.   In contrast, in *Allen* "the government did not argue, unprompted, that Allen manufactured the counterfeit bill. Instead, the government responded to the district court's specific requests." *Id.*   Nonetheless, the Ninth Circuit acknowledged the limits to the prosecutor's obligation to the courts.

> A prosecutor certainly could breach a plea agreement by questioning a witness in support of a sentence higher than the one it promised to support, even if such questioning is in response to a request by the district court. Because the line between neutral questioning and impermissible advocacy is thin, district courts should ordinarily conduct the questioning themselves where they feel it necessary to receive testimony in support of a sentence different from the one the prosecutor has agreed to recommend.

*Id.* at 1176.

In Petitioner's case, the prosecutor was not faced with the quandary of honoring its stipulation or honoring its duties of candor to the court.   The trial court had not asked the prosecutor to answer questions or present evidence on whether minimal legal provocation existed.

Thus, despite the prosecutor's protestations as to the existence of "barely minimal statutory provocation," the prosecutor breached the agreement by volunteering evidence and argument that rejected the existence of provocation.

**Summary re Breach** - As suggested by Petitioner, the prosecution "crossed the line," and went beyond arguing minimal provocation and argued the lack of any legal provocation. If the trial court had adopted the factual determinations and conclusions suggested by the prosecution, the court would have had to conclude that there was no factual basis to support the plea to provoked manslaughter.   That was in breach of the prosecution's agreement that provocation did exist.

## 7.  Unreasonable Factual Determination

Contrary to the foregoing determination, the Arizona Court of Appeals concluded that the plea agreement had not breached.   It is not sufficient for Petitioner to convince this Court

1   that the state court got it wrong.  Rather, to be entitled to habeas relief, Petitioner must show

2   that the state court's determination was unreasonable.  Under the AEDPA, federal courts are

3   authorized to grant habeas relief on the basis of an erroneous state court factual determination

4   only if the state-court decision  "was based on an unreasonable determination of the facts in

5   light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Or,

6   to put it conversely, a federal court may not second-guess a state court's fact-finding process

7   unless, after review of the state-court record, it determines that the state court was not merely

8   wrong, but actually unreasonable."  *Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir. 2004).

9        <u>Types of Unreasonable Determinations</u> - In *Taylor*, Judge Kozinski identified three

10  types of unreasonable factual decisions.  First, there are those where a finding of fact should

11  have been made, and wasn't.  *Taylor*, 366 F.3d at 1000-1001.  Second, there are those

12  situations where the state court misapprehends the legal standard, and that misapprehension

13  affects the fact finding process.  *Id.* at 1001.  Finally, there are those situations where the fact

14  finding process is flawed, e.g. because:(a) there is no hearing or opportunity to be heard; (b)

15  material facts were plainly misapprehended or misstated by the state court; (c) the state court

16  ignores evidence favorable to the defendant.  *Id.*

17       With regard to the failure to consider favorable evidence, "the state courts are not

18  required to address every jot and tittle of proof suggested to them, nor need they 'make

19  detailed findings addressing all the evidence before [them].' "  *Taylor*, 366 F.3d at1001

20  (citation omitted).  "To fatally undermine the state fact-finding process, and render the

21  resulting finding unreasonable, the overlooked or ignored evidence must be highly probative

22  and central to petitioner's claim."  *Id.*

23       Here, the state court's fact finding suffered from two defects: (1) misapprehension of

24  the material facts; and (2) ignoring the central evidence on Petitioner's claim.

25       <u>Misapprehension of Material Facts</u> - With regard to the material facts,  the state court

26  focused exclusively on the propriety of the state arguing the degree of provocation.

27              In this case, the evidence concerning the degree of provocation
             involved was part of the evidence of the circumstances surrounding the
28           commission of the offense.  This evidence was relevant to the issues of

> aggravation and mitigation, and Judge Van Wyck properly considered it in sentencing.

(Traverse Exhibit K, Mem. Dec. at 13.)  The state court failed to acknowledge that the critical factual inquiry was whether the prosecution had actually argued contrary to it's agreement that the homicide was provoked.  Instead, the court sought solace in the Petitioner's ability to offer evidence to support a greater degree of provocation.

> Moreover, the defendant had the opportunity to present evidence that countered the evidence offered by the State to show that the degree of provocation was substantial and led to the commission of the offense.

(*Id.*)

Failure to Consider Central Evidence - With regard to the evidence considered, the Arizona Court of Appeals failed to acknowledge the portions of the record discussed above, where the prosecution had flatly denied the existence of legitimate provocation.  Instead, the state court focused exclusively on the testimony at sentencing by Sergeant Treadway on his belief that the homicide was an unprovoked murder, which testimony had mostly been adduced by leading questioning by the defense.[19]

> It is true that the State presented evidence to demonstrate it's position "that there [was] really barely a statutory minimum of issues of provocation."  Such evidence was primarily presented through the testimony of the investigating officer, Sergeant Treadway, who stated that he believed this was a first degree or second degree murder case. For example, he testified that during his investigation, he found no indication that Lamont had threatened or harassed the defendant. Sergeant Treadway also testified that the defendant told him he initiated the meeting with Lamont and that the defendant stated that he was not afraid that Lamont would attack him with a gun when he went to meet him at the Little America Hotel. The sergeant admitted that he was "resistant to the affect of the provocation causing Mr. DeBerry to lose control" and that his "position [was] that Mr. DeBerry should not have lost control and should not have killed Mr. [L]."

(*Id.* at 11.)  (For testimony by Treadway*, see* Exhibit M, R.T. 6/15/00 at 139 (murder), 140 (no threats), 110 (initiation of meeting), 142-144 (no fear of gun), 204 (resistant to provocation), 205 (lost control).)

---

[19]  This evidence was particularly irrelevant, given Arizona's determination that stipulations in the plea agreement do not limit law enforcement officers. *See State v. Rogel*, 116 Ariz. 114, 116, 568 P.2d 421, 423 (1977) (agreement to "no recommendation" at sentencing did not prohibit police officer from making statements to probation officer).

Distracted by the dispute of whether the trial court could properly consider the degree of provocation for aggravation/mitigation purposes, and focusing on testimony adduced by the defense rather than the arguments of the prosecution, the Arizona court failed to recognize that the prosecution had in fact abandoned it's agreement and had argued that there was no provocation.  Based on that unreasonable determination, the state court concluded that there had been no breach of the plea agreement, and wrongly denied Petitioner's claim.

**8.  Harmlessness of Error**

Despite their acknowledgment that breaches of plea agreements are not subject to prejudice or harmless error analyses (Travers Exhibit K, Mem. Dec. at 10), the Arizona Court of Appeals pointed to the fact that the sentencing judge had refused to consider the degree of provocation in determining his sentence (*id.* at 13).   Indeed, the sentencing judge went to some lengths to acknowledge his acquiescence in the stipulation to the existence of legal provocation.

> But this is a case of manslaughter.  And that is defined . . . That the person commits manslaughter by committing second degree murder upon sudden quarrel or heat of passion resulting from adequate provocation. . . .
> And I reiterate that that is what the case is because that is what the plea was to. . . and there is a substantial factual basis for that as was put on the record by both counsel . . . at the [change of plea] hearing . . . .the state and the defense placed a substantial factual basis showing that there was - - that this was a manslaughter case.
> * * *
> I don't say, and I'm not going to, that Lamont Lattery caused this crisis and that Mr. DeBerry reacted to it.  This is a chicken and egg kind of thing and a horrible combination of things that happened that led to the manslaughter case that is now before me in which Mr. DeBerry killed Lamont Lattery in the heat of passion after provocation.

(Exhibit M., R.T. 6/15/00 at 124-125, 130-131.)[20]

Nonetheless, the lack of reliance by the court on the prosecution's breach is not determinative.

---

[20]  It is interesting, and perhaps telling, to note that the trial court limited the source of the facts supporting the existence of provocation to the statement of factual basis at the change of plea, rather than the evidence presented at sentencing.

1

2

> The harmless error rule does not apply when the government breaches a plea agreement. The integrity of our judicial system requires that the government strictly comply with its obligations under a plea agreement.

3    *U.S. v. Mondragon,* 228 F.3d 978, 981 (9th Cir. 2000) (citations omitted). This is true even

4    though this case is heard on habeas review, where harmlessness is normally applied, even to

5    claims not otherwise susceptible to harmless error analysis. *See Dunn v. Colleran,* 247 F.3d

6    450, 461 (3rd Cir. 2001) (no harmless error analysis on habeas review of *Santobello* claim);

7    and *Acosta v. Turner,* 666 F.2d 949, 953 (5th Cir. 1982) (same).

8

9    **9. Remedies**

10   "Where a plea agreement is breached, the purpose of the remedy is, to the extent

11   possible, to 'repair the harm caused by the breach.'" *Buckley v. Terhune,* 441 F.3d 688, 699

12   (9th Cir. 2006). In *Santobello,* the Court identified two possible remedies: (1) specific

13   performance of the agreement, e.g. by re-sentencing by a new judge without the offending

14   argument; or (2) recision by permitting Petitioner to withdraw his guilty plea. 404 U.S. at

15   262-263. *See also Buckley,* 441 F.3d at 699 (recognizing alternative remedies); *Hovey v.*

16   *Superior Court In and For County of Maricopa,* 165 Ariz. 278, 282, 798 P.2d 416, 420

17   (Ariz.App.,1990) (same); and Blum, *Choice of Remedies Where State Prosecutor Has*

18   *Breached Plea Bargain,* 9 A.L.R.6th 541 (2005) (same).

19   Petitioner does not specify the remedy he seeks. (*See* Amended Petition, #60 at 6, 9;

20   Traverse, #57 at 22, 29.)

21   In *Santobello,* the Court left it to the state courts to select the appropriate remedy. 404

22   U.S. at 263. *See also Gunn v. Ignacio,* 263 F.3d at 965 (9th Cir. 2001) (leaving to state court

23   to fashion remedy after grant of habeas relief on breached plea agreement). *But see Buckley,*

24   441 F.3d at 699 (directing specific performance by entry of agreed upon sentence in light of

25   ineffectiveness of recision after performance by defendant of cooperation agreement). Here,

26   there appears no reason for this Court to impose a specific remedy, nor any practical way for

27   this Court to excise the effects of the breach. Accordingly, the undersigned will recommend

28   that this Court grant relief on Petitioner's Ground Two by issuing an order directing

1   Petitioner's release, unless within thirty days of this Court's judgment the State of Arizona

2   either: (1) grants Petitioner a re-sentencing before a new judge, with appropriate restrictions

3   on the prosecution's ability to challenge the existence of legal provocation; or (2) permits

4   Petitioner to withdraw his plea of guilty.

5       "In directing re-sentencing by a different judge, we do not intend any criticism of the

6   [judge]. Rather, the case law uniformly requires sentencing by a different judge where the

7   government has breached its plea agreement." *U.S. v. Franco-Lopez,* 312 F.3d 984, 994 n.

8   7 (9th Cir. 2002)

9

10  **E.  *APPRENDI / BLAKELY* CLAIM**

11      For his Ground 3(a), Petitioner argues that his jury trial right, as determined in

12  *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296

13  (2004), was violated when the sentencing court aggravated his sentence based on aggravating

14  factors not found by a jury or admitted by Petitioner, including inadequate remorse and drug

15  use, and when the Arizona courts improperly failed to apply these cases to him in his first

16  post-conviction relief petition.  (Second Amended Petition, #60 at  7-7a.)

17      On March 16, 2007, Respondents filed their Supplemental Answer (#54), addressing

18  the claims set forth in Petitioner's Ground Three.  Respondents concede that these grounds

19  are now properly exhausted, but assert that they are without merit because: (1) *Blakely* was

20  not retroactively applicable to Petitioner because it announced a new rule of procedural law,

21  and Petitioner's conviction became final on his sentencing as a result of his waiver of his

22  direct appeal rights; (2) although *Apprendi* applied to Petitioner's sentence, *Apprendi* did not

23  mandate the result Petitioner seeks; (3) *Blakely* does not apply because Petitioner admitted

24  one of the three aggravating factors, which was all that was necessary to authorize the

25  aggravated sentence; and (4) any error was harmless because overwhelming evidence

26  established at least one of the three aggravating factors.

27  / /

28  / /

1    **1.  Retroactivity**

2        **Non-Retroactivity Principles** - "Unless they fall within an exception to the general

3    rule, new constitutional rules of criminal procedure will not be applicable to those cases

4    which have become final before the new rules are announced."  *Teague v. Lane*, 489 U.S.

5    288, 310 (1989) (plurality). The courts have concluded that both the *Apprendi* and *Blakely*

6    decisions establish new constitutional rules of criminal procedure that do not fit within any

7    of the exceptions to *Teague*. *See U.S. v. Sanchez-Cervantes*, 282 F.3d 664 (9th Cir. 2002)

8    (*Apprendi*); and *Schardt v. Payne*, 414 F.3d 1025 (9th Cir.2005).  Thus, they may not be

9    retroactively applied.

10        *Apprendi* was decided June 26, 2000, in the interim between Petitioner's sentence on

11   June 15, 2000, and his first PCR petition in April 2001.  *Blakely* was decided June 24, 2004,

12   in the interim between the Arizona Supreme Court's denial of review on Petitioenr's original

13   PCR proceeding on May 30, 2003 (Exhibit X) and his second PCR petition, filed November

14   4, 2004 (Supp. Exh. 1).

15        Petitioner argues that because he pled guilty, his first PCR petition must be treated as

16   direct review, and therefore *Apprendi* need not be applied retroactively to apply in this case.

17   Petitioner argues that *Blakely* was merely an application or clarification of the principles of

18   *Apprendi*, and thus should apply.  (Traverse, #57 at 25-26.)

19        **Finality** - Respondents argue that Petitioner cannot rely on *Apprendi* because it was

20   decided after his sentencing.  (Supp. Ans. #54 at 10, n.3.)  The non-retroactivity principles

21   of *Teague* only apply when a Petitioner attempts to rely on a decision rendered after his

22   conviction has become "final."  In *Beard*, the Court repeated the general rule:

23             ***Ordinarily***, ascertaining the date on which a defendant's conviction
              becomes final poses no difficulties: **State convictions are final** "for
24            purposes of retroactivity analysis **when the availability of direct
              appeal to the state courts has been exhausted** and the time for filing
25            a petition for a writ of certiorari has elapsed or a timely filed petition
              has been finally denied."
26
     542 U.S. at 411 (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994)) (emphasis added).
27
          Here, however, Petitioner had no right of "direct appeal" as a result of his guilty plea.
28

1   *See* A.R.S. § 13–4033(B) ("In noncapital cases a defendant may not appeal from a judgment

2   or sentence that is entered pursuant to a plea agreement or an admission to a probation

3   violation.").  Arguably, that should ordinarily be the end of the discussion.  However, the

4   Arizona state courts have, for purposes of retroactivity analysis, deemed a pleading

5   defendants' conviction "final" only upon the expiration or exhaustion of a pleading

6   defendant's post-conviction proceeding of right.[21]  This approach is based upon the Arizona

7   courts' determination that a PCR proceeding of right is the equivalent of direct appeal for

8   pleading defendants.

9       Rule 32 incorporates this appeal right [provided under the Arizona
        constitution]: "Any person who pled guilty ... shall have the right to file
10      a post-conviction relief proceeding, and this proceeding shall be known
        as a Rule 32 of-right proceeding." Ariz. R.Crim. P. 32.1. Thus, even
11      though this matter is a post-conviction relief proceeding, by virtue of
        Article 2, Section 24 of the Arizona Constitution, as interpreted by
12      *Montgomery* [*v. Sheldon*, 181 Ariz. 256, 258-59, 889 P.2d 614, 616-17
        (1995), op. supp., 182 Ariz. 118, 893 P.2d 1281 (1995)], it is the
13      functional equivalent of a direct appeal.

14  *State v. Ward,* 211 Ariz. 158, 162, 118 P.3d 1122, 1126 (Ariz.App. Div. 1,2005).  "In *State*

15  *v. Ward*, the Arizona Court of Appeals, after recognizing that new constitutional rules usually

16  apply retroactively only to 'convictions not yet final on direct review,' and not to cases on

17  'collateral review,' placed the Rule 32 of-right proceeding squarely in the former category."

18  *Summers v. Schriro,* 481 F.3d 710, 716 (9th Cir. 2007) (determining finality for purposes of

19  applying statute of limitations under  28 U.S.C. § 2244).  *See Beals v. Bartos,* 2007 WL

20  2220467, CV-06-0801-PHX-JWS (D.Ariz. Aug 02, 2007) (applying *Summers* to retroactivity

21  analysis); *Valentino Mungia v. Ontiveros*, 2007 WL 2461852 , CV-06-2016-PHX-FJM

22  (D.Ariz. Aug 27, 2007) (same).

23      Accordingly, for *Teague* retroactivity purposes, Petitioner's conviction became final

24  on May 30, 2003, when the Arizona Supreme Court denied review on his "of-right" PCR

25  petition.

26  ――――――――――――――――

27      [21] Petitioner's first PCR petition was an "of right" proceeding.  *See* Ariz. R. Crim. P.
    Rule 32.1 ("Any person who pled guilty ...shall have the right to file a post-conviction relief
28  proceeding, and this proceeding shall be known as a Rule 32 of-right proceeding.").

1       **Applicability of _Apprendi_** - Because _Apprendi_ was decided in 2000, long before

2   Petitioner's conviction became final, _Apprendi_ may be applied by this Court to Petitioner's

3   claims.

4       **Applicability of _Blakely_** - On the other hand, Petitioner's conviction was final before

5   the 2004 decision in _Blakely_.   Therefore, _Blakely_ may not be retroactively applied to

6   Petitioner's claims.

7       Petitioner asserts that _Blakely_ was not a new procedural rule, but simply an application

8   of the rule announced in _Apprendi_.   That argument is foreclosed by the Ninth Circuit's

9   decision in _Schardt v. Payne_, 414 F.3d 1025 (9th Cir.2005), where the petitioner also argued

10  "that _Blakely_ did not announce a new rule. Instead, he argues that in _Blakely_, the Court

11  simply applied the rule set forth in _Apprendi_."  _Id._ at 1034.  Noting that every circuit court

12  of appeals presented with the question had ruled opposite from the holding of _Blakely_, the

13  _Schardt_ court concluded that " the rule announced in Blakely was clearly not apparent to all

14  reasonable jurists, nor was it dictated by precedent" and therefore was subject to it's own

15  retroactivity analysis.  _Id._ at 1035.

16      Accordingly, _Blakely_ cannot be applied retroactively, and having been decided after

17  Petitioner's conviction became final, it may not be applied to Petitioner's claims.

18

19  **2.  Application of _Apprendi_ to Petitioner's Claim**

20      In rejecting Petitioner's claim, the trial court[22] did not attempt to apply _Apprendi_, and

21  instead relied upon its determination that _Blakely_ was not retroactively applicable to

22  Petitioner. (Supp. Exhibit 2, Order 5/10/05.)  To the extent that it refused to apply _Blakely_,

23  the state court acted in accordance with Ninth Circuit law.  However, the trial court did not

24  address Petitioner's _Apprendi_ based arguments.   Accordingly, there is no state decision on

25  ───────────────

26      [22]   A federal habeas court reviews the "last reasoned decision" by a state court.
_Robinson v. Ignacio_, 360 F.3d 1044, 1055 (9th Cir. 2004).   Both the Arizona Court of

27  Appeals (Supp. Exhibit 5) and the Arizona Supreme Court (Supp. Exhibit 7) issued summary
decisions denying Petitioner's second PCR petition.  Accordingly, the trial court's decision

28  is the "last reasoned decision"on Petitioner's _Apprendi / Blakely_ claims.

1   the *Apprendi* claim to be entitled to deference, and this Court must conduct an independent

2   review of the claim.  *See Himes v. Thompson*, 336 F.3d 848, 853 and n.3 (9th Cir. 2003)

3   ("Independent review of the record is not *de novo* review of the constitutional issue, but

4   rather, the only method by which we can determine whether a silent state court decision is

5   objectively unreasonable").

6        In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, with

7   the exception of prior convictions, any fact which increases the maximum possible

8   punishment must be determined by the jury and not a judge.

9        In Petitioner's case, until an aggravating factor was found, the maximum permissible

10  sentence was the presumptive sentence of 10.5 years.  Ariz. Rev. Stat. § 13-604(I) (2000).

11  The only way the trial court could impose the greater sentence of 16 years that it chose, was

12  to first find at least one aggravating factor. *See State v. Williams,* 131 Ariz. 411, 641 P.2d

13  899 (Ariz.App., 1982) (aggravated sentences "were unlawfully imposed because they are

14  beyond the presumptive terms provided by statute and no aggravating circumstances were

15  found by the trial court").

16       With the aid of hindsight after the adoption of *Blakely*, it is easy to recognize that

17  *Apprendi* would lead to the decision that the aggravation of Petitioner's sentence would

18  require a factual determination by the judge to extend the maximum sentence from the

19  presumptive to an aggravated sentence.  However, prior to *Blakely*, at least the circuit courts

20  of appeals uniformly found that it was the absolute statutory maximum, not the presumptive

21  maximum without judge determined aggravators, which was affected by *Apprendi*.  *See*

22  *Schardt v. Payne*, 414 F.3d 1025, 1035 (9th Cir. 2005).  The very argument posited by

23  Petitioner "is virtually indistinguishable from the question reviewed by the Supreme Court

24  in *Blakely*."  *Id.* at 1032.  Thus, to accept Petitioner's argument on the basis of *Apprendi*

25  would be the equivalent of applying *Blakely* retroactively, which the Ninth Circuit instructs

26  this Court may not do.[23]

27

28       [23] Arguably, *Apprendi* had already been clarified as applying to increased sentences
    within the statutory range in the state of Arizona.  In *Ring v. Arizona*, 536 U.S. 584 (2002),

- 65 -

1    Petitioner cites to *Kaua v. Frank*, 436 F.3d 1057 (9th Cir. 2006) for the proposition that

2    *Apprendi* alone prohibited the judicial fact finding for sentence aggravation and mitigation.

3    (Traverse, #57 at 27-28.)   However, *Kaua* involved the imposition of an additional repeat

4    offender enhancement, which required a judicial factual determination as prohibited by

5    *Apprendi*.[24]   In contrast, Petitioner's case involved simply the aggravation of a sentence with

6    a prescribed statutory range.   Thus, *Kaua* is distinguishable on the key difference which was

7    ultimately addressed in *Blakely*.

8    Therefore, this Court must conclude that, based on the holding in *Apprendi*, without

9    benefit of *Blakely*, Petitioner's claim is without merit.

10

11   **3.  No Judicial Fact-Finding**

12   Even if this Court could extend *Apprendi* to Petitioner's particular claim, "[f]ailure

13   to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not

14   structural error."  *Washington v. Recuenco,* 126 S.Ct. 2546, 2553 (2006).   Accordingly,

15   Petitioner's claim would be subject to a harmless error analysis.

16   Respondents argue that any error was, in fact, harmless because there was

17   overwhelming evidence supporting the findings, and because Petitioner admitted at least one

18   _____

19   (decided before Petitioner's conviction became final) the Court applied *Apprendi* to

20   invalidate the Arizona capital sentencing system which allowed the judge to determine the
     aggravating factors necessary to a death sentence.   It is tempting to differentiate *Ring* as

21   being a death penalty case.   However, the *Ring* Court saw "no reason to differentiate capital
     crimes from all others in this regard."  *Id.* at 607.  (Arguably the case for applying Apprendi

22   to non-capital crimes is even stronger, given the statutory mandate that those convicted of
     such crimes "shall" receive the presumptive, unless aggravated or mitigated, as opposed to

23   the capital sentencing statute which provided that the convict "Shall suffer death or
     imprisonment ...for life." *See State v. Fell*, 210 Ariz. 554, 558, 115 P.3d 594, 598 (2005); and

24   *State v. Brown*, 209 Ariz. 200, 99 P.3d 15 (2004).)  Nonetheless, this Court is bound by the
     Ninth Circuit's determination in *Schardt* that *Blakely* announced a new rule, and is not

25   retroactive.

26   [24] Part of the finding necessary to that enhancement was based upon prior convictions,
     which remain even today within the province of the judge.   The second step, however,

27   involved a judicial determination "whether an extended sentence is necessary for the

28   protection of the public."  436 F.3d at 1059.  The latter was found to offend *Apprendi*.

of the aggravating factors, and that was all that was necessary to authorize a sentence beyond the maximum. *See State v. Martinez,* 210 Ariz. 578, 584, 115 P.3d 618, 624 (2005) ("a jury finding of a single aggravating factor establishes the facts legally essential to expose the defendant to the maximum sentence prescribed in section 13-702").

If Petitioner admitted any of these facts by his guilty plea, or stipulated to the facts, then there is no concern. *See Blakely*, 542 U.S 296, 310 (2004) (citing *Apprendi,* 530 U.S. at 488) ("When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding.").

Here, the trial court relied upon three aggravating factors: (1) "the emotional and financial harm ... that was caused to the victim's family"; (2) "the lack of remorse"; and (3) "the methamphetamine use." (Exhibit M, R.T. 6/15/00 at 132-133) None of these three aggravating factors were elements of the offense to which Petitioner pled. However, in his sentencing Memorandum, Petitioner proffered that "[e]motional harm to the Lattery family is certainly an aggravating circumstance." (Exhibit J, Sentencing Mem. at 9.) The trial court acknowledged Petitioner's concession, finding "[b]oth the state and the defense agree that [the emotional harm to the family] is a proper aggravating factor." (Exhibit M, R.T. 6/15/00 at 132.)

Petitioner is bound by that admission. *See U.S. v. Hernandez-Hernandez,* 431 F.3d 1212, 1219 (9th Cir. 2005) ("we have repeatedly held that criminal defendants are bound by the admissions of fact made by their counsel in their presence and with their authority"); and *United States v. Buckland,* 289 F.3d 558, 569-70 (9th Cir.2002) (en banc) (no improper judicial fact-finding where drug amount was admitted by defendant during sentencing by failing to challenge presentence report).

Having admitted the existence of an aggravating factor, Petitioner's maximum authorized sentence, even under *Blakely*, was extended to the aggravated term of 21 years. Accordingly, the imposed sentence of 16 years was within the maximum authorized, and the judicial factfinding that resulted in the selection of that particular sentence was not prohibited

1    by *Apprendi* or *Blakely*.

2          Therefore, Petitioner's Ground 3(a) is without merit and should be denied.

3

4    **F.  INEFFECTIVE ASSISTANCE OF COUNSEL**

5          For his Ground 3(b) for relief, Petitioner asserts that he received ineffective assistance

6    of counsel in his first Rule 32 proceeding, when counsel failed to object to the judicial fact-

7    finding of aggravating circumstances.  (Second Amended Petition, #60 at 7-7a.)

8          Respondents argue that: (1) Petitioner had no right to counsel, effective or otherwise,

9    in his PCR proceedings; and (2) counsel cannot be found deficient for having failed to

10   predict *Blakely*.

11        **Standard for Ineffective Assistance** - Generally, claims of ineffective assistance of

12   counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).  In order

13   to prevail on such a claim, petitioner must show:  (1) deficient performance - counsel's

14   representation fell below the objective standard for reasonableness; and (2) prejudice - there

15   is a reasonable probability that, but for counsel's unprofessional errors, the result of the

16   proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694.  Although the

17   petitioner must prove both elements, a court may reject his claim upon finding either that

18   counsel's performance was reasonable or that the claimed error was not prejudicial.  *Id.* at

19   697.

20        **State Court's Decision** - In denying this claim, the trial court did not reference any

21   authority, but did correctly identify the two pronged test from *Strickland*.  However, the

22   Court construed Petitioner's claim as an attack on trial counsel rather than an attack on PCR

23   counsel.[25]  The court then focused on the determination that *Blakely* was decided after

24   Petitioner's sentencing, and therefore found that there was neither deficient performance nor

25   prejudice as a result of trial counsel's failure to argue against what was well-settled law at

26   _____

27        [25]  Petitioner's Second PCR Petition clearly asserted ineffective assistance "when his
     First Rule 32.1 Counsel failed to raise the *Apprendi* issues.  (Supp. Exhibit 1, 2d PCR
28   Petition at 3.)

1  the time of sentencing.   (Supp. Exhibit 2, Order 5/10/05 at 3-4.)

2       Having failed to consider the claim presented by Petitioner, *e.g.* the ineffectiveness

3  of PCR counsel, and deciding instead the effectiveness of trial counsel, the state court failed

4  to decide this claim.  Accordingly, there is again no state decision to be entitled to deference,

5  and this Court must conduct an independent review of the claim.  *See Himes* 336 F.3d at 853

6  and n.3.

7       **Right to Counsel** - As noted, Respondents argue that Petitioner had no right to

8  counsel in his first PCR proceeding.  The Supreme Court has consistently held that "the right

9  to appointed counsel extends to the first appeal of right, and no further."  *Pennsylvania v.*

10  *Finley,*  481 U.S. 551, 555 (1987).  *Finley* is regularly cited for the proposition that there is

11  no right to counsel in state post-conviction relief proceedings.

12       In *Finley*, the Supreme Court based its rejection of a right to appointed counsel in

13  state collateral attacks upon the principal that "the right to appointed counsel extends to the

14  first appeal of right, and no further" and did not extend to a defendant "attacking a conviction

15  that has long since become final upon exhaustion of the appellate process."   The *Finley*

16  Court gave no consideration to the potential that a defendant's claims might not be

17  presentable upon his "first appeal of right" until after a collateral attack was completed.

18  Indeed, such was not the rule in Pennsylvania at the time.  *See Massaro v. U.S.*, 538 U.S.

19  500, 508 (2003) (citing *Commonwealth v. Grant,* 813 A.2d 726, 738 (2002)).

20       The dissenting opinion by Justice Stevens in *Murray v. Giarratano*, 492 U.S. 1, 24-25

21  (1989) (Stevens, J. dissenting, joined by Brennan, J., Marshall, J. and Blackmun, J.),

22  recognized the difficulty imposed when certain claims are pushed from the appellate process

23  to post-conviction proceedings.

24            In contrast to the collateral process discussed in Finley, Virginia law
            contemplates that some claims ordinarily heard on direct review will be

25            relegated to postconviction proceedings. Claims that trial or appellate
            counsel provided constitutionally ineffective assistance, for instance,

26            usually cannot be raised until this stage.

27  *Id.*  Thus, Justice Stevens would have found a right to counsel in post-conviction proceedings

28  involving capital punishment.  In rejecting such a right, the majority did not discuss the fact

1    that post-conviction relief was in some instances the only avenue available for review.

2          Perhaps most telling upon this issue is the Supreme Court's discussion of a right to

3    counsel upon appeal from a state post-conviction remedy in *Coleman v. Thompson*, 501 U.S.

4    722 (1991).

> *Finley* and *Giarratano* established that there is no right to counsel in
> state collateral proceedings. For Coleman to prevail, therefore, there
> must be an exception to the rule of *Finley* and *Giarratano* in those
> cases where state collateral review is the first place a prisoner can
> present a challenge to his conviction. We need not answer this question
> broadly, however, for one state court has addressed Coleman's claims:
> the state habeas trial court. The effectiveness of Coleman's counsel
> before that court is not at issue here. Coleman contends that it was the
> ineffectiveness of his counsel during the appeal from that determination
> that constitutes cause to excuse his default. We thus need to decide only
> whether Coleman had a constitutional right to counsel on appeal from
> the state habeas trial court judgment. We conclude that he did not.
>                                     * * *
> Coleman has had his "one and only appeal," if that is what a state
> collateral proceeding may be considered; the Buchanan County Circuit
> Court, after a 2-day evidentiary hearing, addressed Coleman's claims
> of trial error, including his ineffective assistance of counsel claims.
> What Coleman requires here is a right to counsel on appeal from that
> determination. Our case law will not support it.

15   *Id.* at 755.  Thus the *Coleman* decision stands for the proposition that, whatever the right to

16   counsel in a state postconviction proceeding may be if it is the first place to challenge a

17   conviction, there is no right to counsel on appeal from such a proceeding.[26] *Coleman* did not,

18   however, conclude that there was no right to counsel in the original postconviction

19   proceeding.

20          In *Bonin v. Vasquez*, 999 F.2d 425, 429-30 (9th Cir. 1993), a panel of the Ninth

21   Circuit addressed the issue sidestepped in *Finley* and *Coleman*, *i.e.* whether the fact that a

22   claim may be raised for the first time in post-conviction relief proceedings changes the

23   limitation on the right to counsel in post-conviction proceedings.  The *Bonin* court found that

24   there was no right to counsel in a state post-conviction relief proceeding, even though that

---

26   [26] While the *Coleman* Court seemed appeased with review of Coleman's claims in the
state habeas proceeding, and thus did not find a right to counsel upon subsequent review,
there seems a distinction to be drawn between the case where the review will be by the trial
court, and not an independent habeas court.  In that light, the first opportunity for "review"
will be during any appeal from the trial court's post-conviction proceeding.

1    was the first place the defendant could assert ineffective assistance of counsel.  After noting

2    that issue had not been resolved in *Coleman,* the *Bonin* panel relied upon the practical

3    implications of a finding of a right to counsel, arguing that it would result in an unending

4    cycle of the right to counsel to challenge the ineffectiveness of the prior counsel.

5         *Bonin* was followed in *Jeffers v. Lewis*, 68 F.3d 299 (9th Cir. 1995), where the Court

6    *en banc* reversed a panel decision.  The panel had distinguished *Bonin* as a question of the

7    right to counsel to challenge the ineffectiveness of PCR counsel.  In contrast, Jeffers claimed

8    a right to counsel in a PCR proceeding itself, albeit to challenge the effectiveness of trial and

9    appellate counsel.  *Jeffers v. Lewis*, 68 F.3d at 295 (9th Cir. 1995).  The *en banc* court

10   summarily rejected the panel's holding pursuant to *Bonin*, which it summarized as holding

11   that "a defendant has no Sixth Amendment right to counsel during his state habeas

12   proceedings even if that was the first forum in which he could challenge constitutional

13   effectiveness on the part of trial counsel."  *Jeffers*, 68 F.3d at 300.

14        However, neither *Bonin* nor *Jeffers* arose in the state of Arizona, but were both

15   California cases.  Further, both dealt with the peculiar situation of an ineffective assistance

16   of counsel claim being relegated to post-conviction proceedings.  In contrast, Petitioner's

17   claim relates to the ineffectiveness of post-conviction counsel themselves.

18        And, more importantly, Petitioner was not merely prohibited from asserting an

19   ineffectiveness claim on direct appeal, but had no right to direct appeal.  Thus his first PCR

20   proceeding (or even, perhaps his petition for review therefrom) was his "first appeal of

21   right."  This distinction has not been lost on the State of Arizona, which has, since *Bonin*,

22   found a right to counsel in an "of right" post-conviction proceeding by a pleading defendant.

23        In Arizona, though, a defendant in a non-capital case who pleads guilty
     or no contest waives his right to a direct appeal. Rule 32 thus becomes
24        "the only means available for exercising [his] constitutional right to
     appellate review." Therefore, a pleading defendant such as Pruett is
25   constitutionally entitled to the effective assistance of counsel on his
     first petition for post-conviction relief, the counterpart of a direct
26   appeal.

27   *State v. Pruett*, 185 Ariz. 128, 131, 912 P.2d 1357, 1360 (Ariz.App.1995) (citations omitted).

28   The only way that this Court could impose the holdings of *Bonin* and *Jeffers* in this case

1  would be to ignore the clear pronouncement of the Arizona Courts on the nature of these

2  proceedings.

3      However, in the context of determining the finality of an Arizona conviction for the

4  habeas statute of limitations, the Ninth Circuit has already acknowledged the right of Arizona

5  to define the nature of its proceedings.

> We therefore conclude that Arizona's Rule 32 of-right proceeding for
> plea-convicted defendants is a form of direct review within the meaning
> of 28 U.S.C. § 2244(d)(1)(A). We believe that this conclusion is
> consistent with "the principles of comity, finality, and federalism" that
> AEDPA was intended to promote.

9  *Summers v. Schriro*,  481 F.3d 710, 716 -717 (9th Cir. 2007).

10     In light of the foregoing, and because it does not alter the outcome, the undersigned

11  presumes that Petitioner's first PCR proceeding was the equivalent of a direct appeal, and

12  thus constituted his "first appeal of right," entitling him to the effective assistance of counsel

13  in that proceeding.

14     **Deficient Performance** - Respondents argue that even if Petitioner was entitled to the

15  effective assistance of counsel, counsel was not ineffective for failing to make arguments

16  under *Blakely*.  Here, Petitioner does not precisely argue that PCR counsel should have

17  argued *Blakely*.  Rather, he argues that counsel should have challenged the judicial fact

18  finding, irregardless of the authority for the argument.

19     The reasonableness of counsel's actions is judged from counsel's perspective at the

20  time of the alleged error in light of all the circumstances.  *Kimmelman v. Morrison*, 477 U.S.

21  365, 381 (1986); *Strickland*, 466 U.S. at 689.  A federal habeas petitioner cannot attack

22  counsel's performance based on some later favorable ruling which counsel failed to

23  anticipate.  *See Lockhart v. Fretwell,* 506 U.S. 364, 371-72 (1993) (noting that, under

24  *Strickland*, the assessment of the reasonableness of counsel's performance is based on the law

25  as it existed at the time of counsel's conduct).  Accordingly, Petitioner cannot argue that

26  counsel was deficient for failing to anticipate the holding of *Blakely*.

27     Moreover, Petitioner cannot argue that counsel should have anticipated the rationale

28  of *Blakely*. A deficient performance is one in which counsel's errors were so great he or she

was not functioning as the counsel guaranteed by the Sixth Amendment. *Iaea v. Sunn*, 800 F.2d 861, 864 (9th Cir. 1986). An objective standard applies to proving such ineffectiveness, and requires a petitioner to demonstrate that counsel's actions were "outside the wide range of professionally competent assistance, and that the deficient performance prejudiced the defense." *United States v. Houtcens*, 926 F.2d 824, 828 (9th Cir. 1991)(quoting *Strickland*, 466 U.S. at 687-90).    As discussed above, the Ninth Circuit has already concluded that *Blakely* announced a new rule, one which previously had been repeatedly rejected by the Circuit Courts of Appeals. Aside from the technicalities of the retroactivity analysis, the Ninth Circuit has recognized that "*Blakely* worked a sea change in the body of sentencing law.'" *U.S. v. Ameline,* 400 F.3d 646, 652 (9th Cir. 2005). Therefore, PCR counsel cannot be faulted for failing to argue that *Apprendi* should have been applied to Petitioner in precisely the way that the federal courts were admonishing it should not.

Therefore, Petitioner's Ground 3(b) is without merit and must be denied.

## G.  SUMMARY

Petitioner failed to fairly present his Grounds 1(a) (Mitigation) and 1(c) (Aggravation), and has now procedurally defaulted on those claims. Accordingly, these grounds for relief must be dismissed with prejudice.

The state court's rejection of Petitioner's Ground 1(b) (Remorse) was contrary to Supreme Court law. However, Petitioner has failed to show the violation of a his right to remain silent.   The state court properly rejected that portion of Petitioner's Ground 3(a) based on *Blakely*, but failed to consider his claim based on *Apprendi*. Nonetheless, Petitioner has failed to show he is entitled to relief under *Apprendi*. The state court misapprehended Petitioner's Ground 3(b) (Ineffectiveness of PCR Counsel) as an attack on trial counsel. However, Petitioner has failed to show that  PCR counsel was ineffective. Accordingly, Petitioner's Grounds 1(b) and 3(a) and 3(b) must be denied.

Petitioner exhausted his Ground 2 (Breach of Plea Agreement) by presenting it to the Arizona Court of Appeals. However, that court misapprehended Petitioner's claim as an

assertion of an agreement on the degree of provocation, as opposed to an assertion of an agreement on the existence of provocation. Accordingly, despite having implicitly found the existence of an agreement on the existence of provocation, the state court failed to consider the clear and convincing evidence of the prosecution's breach of that agreement, resulting in a rejection of Petitioner's claim based on an unreasonable determination of the facts. Accordingly, Petitioner is entitled to relief on his Ground 2.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Grounds 1(a) (Mitigation) and 1(c) (Aggravation) of Petitioner's Second Amended Petition for Writ of Habeas Corpus, filed May 8, 2007 (#60) be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that Grounds 1(b) (Silence on Remorse), 3(a) (*Apprendi / Blakely*) and 3(b) (Ineffectiveness of PCR Counsel) of Petitioner's Second Amended Petition for Writ of Habeas Corpus, filed May 8, 2007 (#60) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Ground 2 (Breach of Plea Agreement) of Petitioner's Second Amended Petition for Writ of Habeas Corpus, filed May 8, 2007 (#60) be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that this Court's Writ be issued directing Petitioner's release, unless within thirty days of this Court's judgment the State of Arizona either: (1) grants Petitioner a re-sentencing before a new judge, with appropriate restrictions on the prosecution's ability to challenge the existence of legal provocation; or (2) permits Petitioner to withdraw his plea of guilty.

## V. EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall

1   have ten (10) days from the date of service of a copy of this recommendation within which

2   to file specific written objections with the Court.   *See also* Rule 8(b), Rules Governing

3   Section 2254 Proceedings.   *See also* Rule 10, Rules Governing Section 2255 Proceedings.

4   Thereafter, the parties have ten (10) days within which to file a response to the objections.

5   Failure to timely file objections to any factual or legal determinations of the Magistrate Judge

6   will be considered a waiver of a party's right to *de novo* consideration of the issues.   *See*

7   *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*).

8

9   DATED: September 28, 2007                    _____

10                                                                JAY R. IRWIN
                                                                United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28